654

Rockingham
No. 88-062

JOAN S. DOMBROWSKI

v.

ROBERT K. DOMBROWSKI

June 2, 1989

*John A. Macoul,* of Salem, by brief and orally, for the plaintiff.

*Sheehan, Phinney, Bass & Green P.A.,* of Manchester (*Edward Haffer* on the brief and orally), for the defendant.

BATCHELDER, J. The appeal in this no-fault divorce case arises from the property settlement and alimony findings of a Marital Master (*Stephanie T. Nute,* Esq.), which were approved by the Trial Court (*Gray,* J.). The defendant contends, *inter alia,* that the master over-valued the estate by more than one million dollars, awarded all of that illusory value to him, and thereby inequitably distributed the marital assets. On appeal, the defendant raises five principal issues. We affirm in part, reverse in part, and remand.

The plaintiff, Joan Dombrowski, filed a libel for a no-fault divorce in October, 1985. In June, 1987, the marital master heard three days of testimony concerning marital assets. The master issued her report on October 2, 1987, which the court approved. The defendant, Robert Dombrowski, then moved to have the master reconsider the decree and in February, 1988, the master modified the decree in part. The Court (*McHugh,* J.) approved the modified decree. The defendant appeals from the modified order.

The defendant contends first that the result of the master's erroneous valuation is an inequitable distribution of the marital estate, giving the plaintiff two-thirds of its actual three million dollar value and the defendant only one-third. Specifically, the defendant alleges that the master improperly valued: (1) a

charitable contribution carry-forward deduction under 26 U.S.C. § 170 at $688,976; (2) a numismatic coin collection at $715,745; and (3) a charitable pledge at zero, instead of as a $106,688 debt. The total amount of error, the defendant asserts, is $1,036,409.

The charitable contribution carry-forward resulted from a donation of approximately 180,000 shares of common stock the defendant gave to his former preparatory school, St. Mary's School of Orchard Lake, Michigan. The stock was that of a company, Profit Technology, Inc., of which the defendant was chairman of the board and director of marketing. At the date of the donation, the value of the common stock given to the school was $765,735.

Based on this donation, the defendant took tax deductions of approximately $60,000 and $22,000 for the tax years 1985 and 1986, respectively. This left $688,976 remaining for use to compute charitable tax deductions in future years. At trial, the defendant produced an expert witness, David Skiff, who testified that the $688,976 could be carried forward indefinitely until the defendant fully utilized the deduction. In fact, the carry-forward can only be used for five tax years following the contribution, 26 U.S.C. § 170(d)(1), a fact which was not clarified until appeal to this court. The expert also testified that the value of the carry-forward is not the full amount of the carry-forward (*i.e.* $688,976), but rather the tax savings which result when the appropriate percentage of the carry-forward is subtracted from gross income. Skiff stated that, based upon a federal tax rate of 28%, the maximum value of the carry-forward would be $192,000, but that the defendant would have to earn over two million dollars in income in order to obtain the full benefits from the carry-forward.

The defendant asserts, and we agree, that the master erroneously valued the carry-forward at $688,976, and awarded that value to him. The issue on appeal is what value to assign to the carry-forward. The defendant puts this value at zero, while the plaintiff appears to claim it is $688,976. We accept neither of these numbers. Based on the expert's testimony below, we hold that the value of the carry-forward is the tax savings that result when the deduction is subtracted from gross income. We remand the issue of the valuation of the carry-forward deduction in light of the considerations set forth below.

Accountant Skiff testified that the carry-forward deduction has economic value, although under generally accepted accounting principles a present value would not be assigned because of certain unknown variables, including the defendant's

income, the federal tax rate, and interest rates. Despite these uncertainties, we hold that the carry-forward deduction does have economic value which should be included in the marital estate. Because the amount of the deduction depends in part upon the defendant's adjusted gross income, determining the precise amount of the tax savings may be difficult. Courts, however, often must make decisions about value when absolute precision is not possible, and the court must do so here. The master will have for consideration the defendant's tax returns for several years since the contribution was made. His income over time, the portion of the contribution carry-forward deduction already used, the expert's testimony concerning the maximum tax savings of the carry-forward, and the Internal Revenue Code may serve as guides in assigning a value to the carry-forward.

The next area in which the defendant alleges an improper valuation is the numismatic coin collection, determined by the master in the decree to have a value of $715,745. The defendant owned numerous coins at the time of the divorce, some of which were Krugerrands, Mexican silver dollars, and Canadian maple leafs; and in addition, there were various coins designated as numismatic coins. In other words, these were coins whose value is determined by worth in the collector's market, rather than by the amount of gold and silver content, as would be the case with the Krugerrands, Mexican silver dollars, and Canadian maple leafs. In determining the value of the marital assets, a point of reference for the trier of fact in some cases is a view of the values assigned in the respective affidavits of the parties filed pursuant to Superior Court Rule 158. The plaintiff's affidavit lists the numismatic coins at $715,745, together with the remaining coins achieving a total value of $1,040,267, which is the precise amount adopted by the master in awarding the coin collection to the defendant in the decree. The defendant's affidavit, on the other hand, merely lists "coins — $793,562." Based upon the affidavits alone, the difference in the parties' respective views of the value of the coins as marital assets is $246,705.

The major point of contention in the defendant's view of the discrepancy is that the master found in ruling upon the defendant's request that the numismatic coins "must be valued at current market value, and not original cost," and went on to deny a finding concerning the value of the numismatic coins at $475,000. However, the $475,000 value was the only evidence in the case concerning the current market and was in fact disallowed by the master. This results in a record showing a determination by the

master that market value governed, yet the finding of numismatic worth was based upon invoices setting forth the purchase prices of the various coins as they were acquired over a period of years. The evidence as allowed in the record, without more, does not provide the necessary underpinning for the ultimate determination of value in this case. In view of this, we remand the issue of the worth of the numismatic coins for further hearing. The questions as to whether the defendant, as owner, *Arlington Mills v. Salem*, 83 N.H. 148, 140 A. 163 (1927), or as expert, N.H. R. Ev. 702, may venture an opinion as to market values are determinations to be made in the exercise of sound discretion by the master.

The defendant also alleges that the master failed to value properly a charitable pledge liability of $106,688. We reject this claim. The pledge resulted from the defendant's promise to pay for the construction of a field house at the St. Mary's School, in Michigan. Between 1972 and 1980, he paid all but the remaining $106,688 cost of the $927,767.34 building. The defendant has not made any further payments on that amount since 1980. In 1985, however, he donated $765,735 worth of Profit Technology, Inc. stock to St. Mary's School. The master did not include the stock as a marital asset, but apparently considered the donation to have satisfied the remaining field house pledge for property distribution purposes. We agree with the master's ruling on the debt, notwithstanding the defendant's argument that under the law of Connecticut, where the pledge was made, he had an enforceable obligation to the school. His agreement with the school, which allows the pledge to be paid when the defendant's tax and investment circumstances permit and, presumably, if they permit, made consideration of that pledge unnecessary.

The defendant next contends that the marital master misapplied the equal distribution rule of *Hodgins v. Hodgins*, 126 N.H. 711, 497 A.2d 1187 (1985). In *Hodgins*, we stated that, absent special circumstances, the distribution of marital assets should "be as equal as the court can make it." *Id.* at 715, 497 A.2d at 1190. The defendant argues not only that the master improperly valued the three items discussed above and assigned the illusory value to him, but also that the master should have divided most of the assets equally between the parties. He claims further that the master did not credit him for $543,000 worth of wealth he claims to have provided the plaintiff since they first separated in 1981. In his motion for reconsideration, and on appeal here, the defendant

proposed a distribution plan which he alleges would result in an equal distribution.

■ The master stated her intent to divide the marital estate using the *Hodgins* rule. She specifically rejected the defendant's proposal to divide each asset equally, in favor of a division in light of the total nature of the assets. Her decision was not error. The master had no duty to divide each asset equally; rather, her responsibility was to look at the assets as a whole and propose an equitable distribution. *Azzi v. Azzi*, 118 N.H. 653, 656, 392 A.2d 148, 150 (1978). Because the master erred in valuing the charitable contribution carry-forward deduction and the numismatic coins, however, once she determines a new value for those assets, she will have to make adjustments in the property settlement to comply with the *Hodgins* rule.

■ The defendant next argues that special circumstances justify his receiving a greater share of the assets than the plaintiff receives. In his view, three "special circumstances" justify his receiving a greater share of assets: (1) the size of the marital estate; (2) his $543,000 worth of contributions to the plaintiff since their initial separation in 1981; and (3) his creation of the marital wealth. We have said that among the special circumstances that may justify an unequal property distribution are: (1) a short marriage; (2) one party's exclusive premarital possession of an asset that continues after the marriage; (3) a party's recent acquisition of an asset through a family relationship; (4) a party's need to provide a home for minor children; (5) the need to assure each party's future security; and (6) the fault of either party. *McAlpin v. McAlpin*, 129 N.H. 737, 740, 532 A.2d 1377, 1379 (1987); *Hodgins*, 126 N.H. at 714–15, 497 A.2d at 1189–90.

■ None of the defendant's alleged special circumstances is of the type referred to in *Hodgins* or *McAlpin* which might justify an unequal distribution. First, the size of the marital estate alone cannot justify an unequal distribution where the parties each contributed equally to their thirty-year marriage. The master specifically found that the parties' long-term marriage was an "economic partnership" in which both parties played an equal role in the acquisition of assets—the plaintiff primarily as homemaker and caretaker of the children, and the defendant as the "primary breadwinner" in the computer and electronics industry.

Second, the alleged wealth contributed to the plaintiff, consisting of $275,000 from the 1984 sale of the Connecticut marital home, $110,000 from court ordered support payments, and the remainder from "voluntary" payments, is not the type of special circumstance which would justify an unequal distribution in this case. The plaintiff had held title to the marital home in her name alone since 1968, when the defendant transferred his half-interest to her. When she sold the home in 1984, more than one year before the divorce libel was filed, some of the proceeds went into the purchase of her current home in Rye. The master awarded the Rye home to the plaintiff and assigned it an equity value of $118,500, thereby reducing the alleged $275,000 contribution by that amount. Given the nature of the assets in this case, we do not consider the alleged contribution of the marital home proceeds remaining after the purchase of the Rye house to warrant an unequal distribution to the defendant.

Another element of the wealth the defendant contributed to the plaintiff was court-ordered support payments made prior to the divorce decree's issuance. Because a spouse is legally obligated to provide support for his or her spouse, where possible, *see* RSA 546-A:2, the master did not abuse her discretion in not considering the prior support payments a special circumstance requiring an unequal distribution. The same holds true for any "voluntary" payments the defendant may have made. The master's proper exercise of discretion becomes even more evident when one considers that the parties reconciled for part of the time for which the defendant seeks credit.

Third, the defendant argues that because the marital wealth originated from his career and investments, this fact constitutes a sufficient special circumstance to require an unequal division of property in his favor. We reject this argument in light of the important contributions both parties made to the marriage. Neither the alleged "special circumstance" argued here, nor the other considerations raised by the defendant, are the sort of special circumstances, *see McAlpin supra,* which justify an unequal distribution of assets.

The defendant next contests the provisions in the master's amended decree requiring him to pay, for one year, alimony and certain insurance coverages for the plaintiff's benefit. We have stated that a master has broad discretion to make an award of alimony. *Ebbert v. Ebbert,* 123 N.H. 252, 255, 459 A.2d 282, 285 (1983). The defendant claims that the size of the property

distribution and the ability of the plaintiff to obtain employment make alimony payments unnecessary. We do not find, however, that the order to pay alimony and certain insurance coverages for one year was an abuse of discretion. The master considered the length of the marriage, the parties' contributions to the marriage, and the employability and earnings available to each party at the time of trial, among other factors. The master committed no error.

The defendant also argues in his reply brief that the alimony order was an abuse of discretion because it did not take into consideration the adverse tax consequences to him of requiring alimony payments in excess of $15,000 for one year only. *See* 26 U.S.C. § 71(f) (1987). He correctly points out that the tax consequences of alimony payments are appropriate considerations when ordering such payments, *see Ebbert supra*. The defendant, however, never raised that issue below in his motion for reconsideration, nor did he even mention it in his notice of appeal to this court. We will not consider issues raised for the first time on appeal, *see Marsh v. Marsh*, 123 N.H. 448, 450, 462 A.2d 126, 128 (1983); and questions briefed must be set forth in the notice of appeal, *see* SUP. CT. R. 16(3)(b).

Lastly, the defendant argues that the master abused her discretion in finding him in contempt for failing to pay alimony and ordering him to pay attorney's fees for the contempt motion. He claims that a pretrial, temporary stipulation and order preventing the sale of assets rendered him illiquid and unable to pay the alimony. On December 29, 1987, the defendant moved to have the temporary stipulation and order terminated. The master held a hearing on the defendant's motion. No record was made of the hearing, and the master denied the motion on February 3, 1988.

On March 15, 1988, the plaintiff moved to have the defendant held in contempt of court for non-payment of alimony and certain other expenses. The master held a hearing, for which there is no transcript. The defendant maintains that he provided uncontradicted evidence that the stipulation left him unable to pay alimony. The plaintiff contends that she contradicted the evidence by submitting summaries indicating the amount of liquid assets the defendant had available to pay his obligations. These summaries indicated that from June through November, 1987, the defendant had approximately $120,000 available to him. In his reply brief, the defendant states that even if that amount is correct, the plaintiff's summaries do not address his illiquidity after November, 1987.

 Where no record of a hearing is made, we must assume, for the purposes of appeal, that the evidence supported the master's findings, and we limit our review to legal errors apparent on the record available to us. *Perron v. Aranosian*, 128 N.H. 92, 94, 508 A.2d 1087, 1089 (1986); *Cote v. Cote*, 123 N.H. 376, 377–78, 461 A.2d 566, 567 (1983). The liquidity issue, and hence the contempt issue, are factual ones. On this limited record, we cannot say that the master abused her discretion in granting the contempt motion and awarding attorney's fees.

> *Affirmed in part; reversed in part; remanded.*

SOUTER, J., did not sit; the others concurred.