Hillsborough
No. 88-440

ARMAND YERGEAU

v.

DORIS YERGEAU

January 31, 1990

*Bruce F. Dalpra* and *Elizabeth Cazden,* of Manchester (*Mr. Dalpra* and *Ms. Cazden* on the brief, and *Ms. Cazden* orally), for the plaintiff.

*Brennan & Caron P.A.,* of Manchester (*Michael J. Iacopino* on the brief and orally), for the defendant.

SOUTER, J. This appeal raises issues of law, evidentiary sufficiency and adequacy of findings underlying a decree of divorce for adultery and an award of alimony by the Superior Court (*Murphy,* J.; *Alice S. Love,* Esq., Master). We affirm.

For most of the time between the parties' marriage in 1950 and their divorce in 1988, the plaintiff, Armand Yergeau, worked as a fireman, while the defendant, Doris Yergeau, devoted herself to caring for their three children and holding part-time jobs. After the plaintiff's retirement in 1986, he began a painting and papering business, from which he netted $20,000 in the year preceding the divorce. At the time of the hearing the defendant continued to work, although she testified that she was limited to part-time employment by medical problems that included hearing abnormalities, susceptibility to ear infections and ulcers.

For at least the last five years of the parties' relationship, the plaintiff was an alcoholic, and in 1986 he joined Alcoholics Anonymous (AA), at whose meetings he met a woman who soon became a close friend. By late 1987 the parties' marriage was clearly deteriorating, and at a New Year's Eve gathering at the end of that year, the plaintiff's expressions of interest in other women led the defendant to mention the possibility of divorce. In mid-January of 1988 the defendant went to Florida alone on a vacation paid for as a gift by the plaintiff, and upon her return in early February the plaintiff told her that he wanted a divorce. That same evening, he told the parties' daughter, in the defendant's presence, that he loved another woman, and the next morning he left the house. The plaintiff testified that the defendant physically threw him out on this occasion; the defendant denied this. In any case, the plaintiff returned to the marital home nine days later, and although he told the defendant that she would hate him for what

he had done, the parties agreed to try to preserve their marriage. On March 15, 1988, however, the plaintiff executed a libel seeking divorce for irreconcilable differences, RSA 458:7-a, and on March 16 he left the house with his personal belongings.

The defendant understood that the plaintiff's relationship with his friend from AA was the impetus for his wish to end the marriage, and the defendant testified that at that point, after enduring years of the plaintiff's alcoholism, she would not accept defeat from another woman. She took to observing the plaintiff and his friend as they went to AA meetings together, and later in the evenings she would drive to a spot where she could see the plaintiff's truck parked in front of the other woman's apartment building. Although the defendant would go home to sleep for a few hours, she would return again, always finding the truck parked in the same place at 6:30 or 7:00 a.m. She reacted with tears and what she herself described as the behavior of a robot, until in April, 1988, she filed a cross libel for divorce on the ground of adultery, RSA 458:7, II, and named the other woman as co-respondent. Thereafter the plaintiff and the co-respondent lived together.

After trial, the master recommended entry of a decree of divorce on the basis of the plaintiff's adulterous fault. In so rejecting the no-fault ground of irreconcilable differences invoked by the plaintiff's own libel, the master in effect found adultery to be the "primary cause of the marital breakdown." *Ebbert v. Ebbert*, 123 N.H. 252, 254, 459 A.2d 282, 284 (1983).

The plaintiff challenges this determination, arguing that there was no adequate circumstantial evidence, *see Jeanson v. Jeanson*, 96 N.H. 308, 309, 75 A.2d 718, 719 (1950), that he engaged in adultery with the co-respondent prior to his second and final departure from the marital residence after executing his libel for divorce. From this he argues that the adultery cannot reasonably be found to have caused the breakdown of the marriage, upon which any divorce must be predicated.

In addressing this position, it is well to be clear at the outset that under existing case law there is no set of facts on which the plaintiff could be said to have been entitled as a matter of law to a divorce on grounds of irreconcilable differences at the time of the March separation when he signed his libel. This is true not merely because marital breakdown and its irremediability are issues of fact, *see Desrochers v. Desrochers*, 115 N.H. 591, 594, 347 A.2d 150, 153 (1975); *Woodruff v. Woodruff*, 114 N.H. 365, 367, 320 A.2d 661, 663 (1974), but because any finding that such breakdown is irremediable must be made by a court, and only after "the

possibilities of reconciliation have been explored and have failed," *Woodruff*, 114 N.H. at 368, 320 A.2d at 663, as mandated by RSA 458:7-b. Indeed, whenever § 7-b is applicable, a court's obligation to determine primary causation from two or more causes for divorce, *see Ebbert v. Ebbert*, 123 N.H. at 254, 459 A.2d at 284, can never be discharged by mechanically determining which accrued first in time. It was, therefore, incumbent on the master to enquire into the primacy of causation as a factual issue.

In assessing the causation evidence in a case like this one, it is, of course, true that "a period of separation due to marital difficulties is strong evidence of irremediable breakdown ... [as against which] the desire of one spouse to continue the marriage is ... not a bar to divorce," *Desrochers*, 115 N.H. at 593–94, 347 A.2d at 152. It is likewise true that the facts in a given case may indicate that the primary cause of the breakdown was incompatibility manifested by a separation occurring prior to any infidelity, *see Murano v. Murano*, 122 N.H. 223, 229, 442 A.2d 597, 600–01 (1982). But it is equally within the ambit of factual possibility in such a case that "the desire of one spouse to continue the marriage is evidence of 'a reasonable possibility of reconciliation,'" *Desrochers*, 115 N.H. at 594, 347 A.2d at 152, which is only eliminated by the other spouse's subsequent fault. In a case of this latter type, it is appropriate for the court to find the subsequent fault to be the primary cause of the ultimate marital breakdown and to decree a divorce accordingly.

■ This is exactly what we understand the master to have found in the case before us. In expressly accepting the defendant's evidence that she repeatedly saw the plaintiff's truck parked at night and early in the morning outside the co-respondent's apartment building after the March separation, the master made it clear that she was considering post-separation adultery as the primary cause of the marital breakdown, and the record supports that conclusion. The parties had separated once before, only to return to each other with at least some degree of professed intent to preserve their marriage, and the testimony warranted a finding that the defendant remained determined to repair the marriage until the repeated indications of continuing adultery convinced her that reconciliation was no longer possible, and depleted her resolution to achieve it. *See Cross v. Grant*, 62 N.H. 675, 686 (1883). From this evidence the master was entitled to conclude that the defendant's determination was enough to preserve the possibility of reconciliation even after the plaintiff's departure in March, and

that it was only the plaintiff's subsequent infidelity that defeated that possibility, and, with it, finally destroyed the marriage itself.

Given our view that adultery following the March separation was properly considered in ascertaining the cause of the final marital breakdown, and given the ample circumstantial evidence that the adultery occurred prior to the filing of the defendant's cross-libel alleging it, there is no occasion here for any detailed consideration of the plaintiff's argument that we should enhance the quantum of evidence necessary to prove fault as a ground for divorce. It is enough to say that we do not believe that *Jeanson v. Jeanson*, 96 N.H. 308, 75 A.2d 718, was intended to be read, or should be read today, as expressing what the plaintiff terms a "tolerant" attitude toward the burden to prove allegations of adultery as such a ground. Although the *Jeanson* court affirmed the view that circumstantial evidence of adultery could suffice, and spoke of evidence of "both opportunity and inclination" as competent, *id.* at 309, 75 A.2d at 719, *Jeanson* is no authority for the proposition that evidence justifying nothing more than suspicion will suffice to prove the adultery suspected. It is worth recalling that the testimony in *Jeanson* indicated that the husband had refused to make any "promise" in response to his wife's insistence that he "stop going with" the co-respondent (though he denied misconduct) and thereafter had left the home of his wife and two children to live in a separate four-room house with the co-respondent, who acted as housekeeper for four years prior to the institution of divorce and legal separation proceedings. This evidence supported a reasonable inference of adultery to the degree of preponderance, a standard likewise satisfied in the instant case.

■ Having found adultery as the cause of breakdown, the trial court evidently considered this fault in determining the amount of alimony, which the plaintiff challenges. Although his dispute with the finding of fault itself is answered above, we need to address his further contention that the evidence fails to satisfy the further statutory condition that fault may be considered when setting alimony only if it "[c]aused substantial physical or mental pain and suffering ... or [r]esulted in substantial economic loss to the marital estate or the injured party." RSA 458:16-a, II(*l*)(1) and (2), :19, IV (Supp. 1988). Referring to the first alternative of causing substantial pain and suffering, the plaintiff argues that "substantial" requires proof of more than the emotional dislocation and stress that any injured party can be expected to feel at such a time. Although we accept the plaintiff's point, we think the master was entitled to find the defendant's burden satisfied. She testified not

only to tears and what she described as her robot-like behavior, but to obsessive conduct in surveillance of the plaintiff's and co-respondent's comings and goings, parking in her car until the wee hours of the mornings where she could observe the plaintiff's truck in front of the co-respondent's apartment, and returning at dawn after little sleep to see if he had left. From this course of behavior, the master was entitled to infer a degree of emotional pain significantly exceeding the inevitable wrenching when spousal fault brings marriage to an end.

The plaintiff next cites *Henry v. Henry*, 129 N.H. 159, 162–63, 525 A.2d 267, 269 (1987), in challenging the adequacy of the master's findings to support an indefinite alimony award of $80 a week in addition to half of the plaintiff's pension of $525 a month. In *Henry*, the master had failed to discuss any arguably relevant facts when reducing a previously stipulated amount of alimony payable to a female plaintiff disabled by continually progressing multiple sclerosis, and had swept the circumstances favoring a continuation of the agreed amount under the ostensibly inapposite rug of alimony's generally rehabilitative objective. *Id.* In the absence of any articulated justification for such a surprising decree, we reversed it as an abuse of discretion. No such ostensible unreasonableness infects the instant award, however.

The master's finding included not only the plaintiff's fault, but the defendant's incapacity to support herself at the accustomed marital level. The master noted her hearing loss and susceptibility to infection, her ulcers, and her otherwise precarious medical condition as indicated by two surgical procedures in 1987, a heart catheterization and the removal of cancerous polyps. These findings supported the defendant's position that she could not work full-time, and her net monthly salary of about $100 obviously required supplementation beyond the monthly pension benefit and the income to be derived from her anticipated share of less than $70,000 from sale of the family house. Her claim of need was further enhanced by the evidence that she would be unable to obtain medical insurance on the termination of her coverage under the plaintiff's policy. This is a far cry from a record of laconic and conclusory findings at odds with evidentiary indications, and the decree may stand in harmony with *Henry*.

 Nor, finally, do we see any merit in the plaintiff's claim that the decree lacked findings necessary to establish his capacity to earn enough to pay the $80 a week. The evidence was that he had been sober for three years, was fifty-one years old and in good health. He admittedly had netted about $20,000 a year from his

business, and the trial court was not bound to assume, in the absence of other evidence, that his earning capacity was limited to that amount.

*Affirmed.*

All concurred.