Portsmouth Family Division
No. 2002-240

IN THE MATTER OF BRADFORD WATTERWORTH AND
JULIE WATTERWORTH

Submitted March 5, 2003
Opinion Issued: April 30, 2003

*Marshall Law*, of East Kingston (*Keri J. Marshall* on the brief), for the petitioner.

*John A. Macoul,* of Salem, by brief for the respondent.

DALIANIS, J. The respondent, Julie Watterworth (Wife), appeals the orders of the Portsmouth Family Division (*DeVries,* J.) approving the final divorce decree recommended by the Marital Master (*Stephanie T. Nute,* Esq.). She objects to the trial court's calculation of child support and division of marital assets. We affirm in part, vacate in part and remand.

Wife married the petitioner, Bradford Watterworth (Husband), in September 1982. The parties separated in 1997 and have three school-aged daughters born in 1988, 1990 and 1994, respectively. Husband is an orthodontist. Since 1986, he has been a part owner of Pingree & Watterworth, P.A., an orthodontic practice. Over a five-year period, he purchased one-half of the shares of this professional association for approximately $21,000. Wife has an undergraduate degree in medical technology and has not worked outside the home since before the couple's first child was born.

Husband commenced no fault divorce proceedings in March 2000. Following a four-day hearing, the court issued a final divorce decree. The court awarded Wife $3,000 per month in alimony and required Husband to pay $4,000 per month in child support.

The court found that the total value of the marital estate was $1,402,260. It ruled that an equal distribution of the marital estate was equitable. It awarded assets valued at $807,708 to Husband and assets valued at $594,552 to Wife and required Husband to pay Wife the sum of $106,578 to equalize the distribution. As a result, each party received $701,130 in assets. Among the assets Wife received were the equity in the marital home ($410,000), which is unencumbered by a mortgage, and significant cash assets, including her individual retirement account ($33,656), money market account ($22,000), checking account ($20,000), and investment account ($85,125).

Among the assets Husband received was the value of his interest in the orthodontic practice, which the court, accepting the testimony and report of Husband's expert witness, valued at $75,148. Husband was also awarded the value of his pension account in the orthodontic practice's defined contribution pension plan, which the court valued at $450,382 as of the date of the final hearing. Husband also received the value of his profit-sharing account in the orthodontic practice's profit-sharing plan, which the court valued at $41,445 as of the date of the final hearing.

Wife moved for reconsideration. Following an additional hearing, the court modified the final divorce decree in ways that neither party challenges on appeal and otherwise denied Wife's motion. This appeal followed.

"We afford trial courts broad discretion in determining matters of property distribution, alimony and child support in fashioning a final divorce decree. We will not overturn the trial court's decision absent an unsustainable exercise of discretion." *In the Matter of Crowe & Crowe*, 148 N.H. 218, 221 (2002) (citation omitted).

## I. Child Support

Wife first argues that the court miscalculated the child support award. RSA chapter 458-C governs the calculation of child support awards. To determine the total support obligation of the parties, the trial court must multiply their net income by a percentage that corresponds to the number of children they have. *See* RSA 458-C:3 (Supp. 2002). Net income is the parents' "combined adjusted gross income" less certain statutorily described deductions. RSA 458-C:2, VI (Supp. 2002). Adjusted gross income is gross income less: (1) court-ordered or administratively-ordered support "actually paid to others, for adults or children"; (2) 50% of "actual self-employment tax paid"; (3) "[m]andatory, not discretionary, retirement contributions"; (4) "[a]ctual state income taxes paid"; and (5) "[a]mounts actually paid by the obligor for allowable child care expenses or medical insurance coverage for the minor children to whom the child support order applies." RSA 458-C:2, I (Supp. 2002).

When calculating child support, the trial court excluded from Husband's gross income contributions the orthodontic practice made on his behalf to his pension and profit-sharing accounts. The court found that these plans were "mandatory" and thus subject to exclusion under RSA chapter 458-C. Wife argues that this was error. We agree.

In matters of statutory interpretation, we are the final arbiter of legislative intent as expressed in the words of the statute considered as a whole. *See Crowe*, 148 N.H. at 224. We first examine the language of the statute and ascribe the plain and ordinary meanings to the words used. *See id.* "[W]hen a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we refuse to consider what the legislature might have said or add language that the legislature did not see fit to incorporate in the statute." *In re Baby Girl P.*, 147 N.H. 772, 775 (2002). "Furthermore, we interpret statutes in the context of the overall statutory scheme and not in isolation." *In the Matter of Coderre & Coderre*, 148 N.H. 401, 403 (2002) (quotation omitted).

We assume, without deciding, that both the pension and profit-sharing plans were "retirement" plans. We note, however, that RSA 458-C:2, I, does not distinguish between retirement plans that are "mandatory" or "discretionary." Rather, it refers to retirement plan

contributions that are either "mandatory" or "discretionary." In context, we hold that the phrase "[m]andatory, not discretionary, retirement contributions" refers to contributions the divorcing party has made to a retirement plan, not contributions that the party's employer has made on the party's behalf. All of the amounts to which RSA 458-C:2, I, refers are those that the obligor "actually paid," not amounts that were paid on his or her behalf. In context, an obligor's gross income and corresponding child support obligation is lowered only by mandatory retirement contributions. In this way, the legislature ensured that an obligor could not avoid or diminish his or her child support obligation by making large discretionary contributions to retirement.

 Both the pension and profit-sharing plans provided by the orthodontic practice to Husband and other employees are funded entirely by the practice. Because Husband did not contribute out-of-pocket to either his pension or profit-sharing account, it was error for the trial court to deduct from his gross income the practice's contributions to these accounts.

Wife asserts that the trial court also excluded from Husband's gross income $3,000 he received annually from the practice for medical expense reimbursement. Husband counters that this point is "moot" because he included the $3,000 as income in his support affidavit and the trial court accepted his income figures. We cannot resolve this factual dispute on appeal and direct the trial court to resolve it on remand.

Wife also argues that the trial court impermissibly deviated from the child support guidelines. RSA 458-C:5 (Supp. 2002) permits the trial court to adjust a child support award upon finding special circumstances. Among the special circumstances the statute recognizes is "[t]he opportunity to optimize both parties' after-tax income by taking into account federal tax consequences of an order of support." RSA 458-C:5, I(f).

The trial court calculated the amount due under the uniform child support guidelines as $6,125 per month, but deviated from the guidelines by allocating some of the child support to alimony to achieve tax benefits. Accordingly, the trial court reduced Husband's monthly child support obligation to $4,000 and ordered him to pay $3,000 in monthly alimony. This too was error.

 Just as "[a]limony should not be awarded under the guise of child support," child support should not be awarded under the guise of alimony. *Coderre*, 148 N.H. at 406. Alimony and child support serve different public policies, are governed by different statutes, are awarded based upon different factors, and are terminated for different reasons. *See id.*; *see also* RSA 458:17, :19 (Supp. 2002). Because we hold that the trial court

erroneously allocated child support to the alimony award, we vacate both awards and do not address Wife's argument that the alimony award was insufficient under RSA 458:19.

## II. Property Division

Wife next argues that the court inequitably divided the parties' assets by valuing Husband's interest in the orthodontic practice pursuant to a "buy-out" provision in the shareholders' agreement (Agreement) between Husband and Dr. Pingree, and valuing Husband's pension and profit-sharing plans as of the date of the final hearing. Wife further contends that an equal distribution of assets was not equitable, and asserts that the court should have awarded her a greater percentage of the parties' assets.

### A. Orthodontic Practice

Both parties submitted expert testimony as to the fair market value of Husband's interest in the orthodontic practice. "Fair market value is defined as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts." G. SKOLOFF ET AL., VALUATION AND DISTRIBUTION OF MARITAL PROPERTY § 29.05[2] (2003); *see Rattee v. Rattee*, 146 N.H. 44, 50 (2001). Both experts assumed that the practice would continue as a going concern.

Wife's expert valued Husband's interest in the practice according to the "capitalization of excess earnings" method. This method "involves first valuing the tangible assets of the subject enterprise, then adding a value for goodwill by capitalizing any earnings in excess of a reasonable return on the tangible assets." G. SKOLOFF ET AL., *supra* § 29.05[3][c]. Generally, the capitalization of excess income approach in professional practices involves

> initially comparing the average income of the subject professional to the average income of a salaried professional with equivalent education, experience, skill, etc. Second, a fair return on the professional's invested capital in the practice is ascertained and is deducted from the professional's average earnings as are the average earnings of the salaried professional. The difference, if any, constitutes the excess earnings which are capitalized and then constitute the value of goodwill.

*Id.*

Using this approach, Wife's expert valued the practice's tangible assets at $63,056. The expert determined that the average salary for two orthodontists would be $320,000 per year. The expert calculated the excess earnings as $297,035 and, selecting a capitalization rate of 33 1/3%, determined that the value of goodwill was $891,194. By adding together the value of goodwill ($891,194) and the value of the tangible assets ($63,056), the expert calculated the total value of the practice to be $954,250.

Wife's expert also used two other methods by which to estimate the value of the practice and then averaged all three methods to determine Husband's share. Based upon the average of the three methods, Wife's expert estimated that the total fair market value of the practice was $951,489 and that Husband's 50% share was worth $475,745.

While Wife's expert did not consider the Agreement between Dr. Pingree and Husband, Husband's expert regarded the Agreement as "the single most important factor influencing the fair market value" of Husband's interest in the practice. The Agreement provides that, in the event of a shareholder's death, disability, retirement or termination of employment, the practice *must* buy the shareholder's stock at the price derived from the Agreement's purchase price formula. The price of the shareholder's stock is equal to a percentage of the practice's net worth as of the last day of the most recently ended fiscal year preceding the shareholder's death, disability, retirement or termination of employment. The percentage corresponds to the proportion that the number of shares to be purchased bears to the total number of shares issued and outstanding as of the last day of the most recent fiscal year.

The net worth of the practice is the net value set forth in the practice's books and records, as determined by a certified public accountant, with certain adjustments. One of the adjustments to the practice's net value is that "[n]o allowance of any kind shall be made for good will, trade name, or any similar intangible asset of the Corporation unless previously recorded on its books."

The Agreement provides that the purchase price formula is "binding and conclusive upon all parties." It further provides that a shareholder

> may not, during his lifetime, sell, exchange, pledge, assign, mortgage, hypothecate or otherwise in any manner whatsoever dispose of or encumber any of the shares of Stock of Corporation which he now owns or hereafter at any time shall acquire, without the prior written consent of the Corporation and all of the other Shareholders.

The Agreement also prohibits the shareholders, individually or collectively, from selling or transferring their stock other than in accordance with the Agreement.

Husband's expert applied the pricing formula to determine the practice's net worth as of the last day of the most recently ended fiscal year, which he then multiplied by 50% to determine the fair market value of Husband's equity interest in the practice. Using this formula, Husband's expert assessed the fair market value of the shareholders' equity as of the date of his opinion (June 19, 2000) as $150,295. He assessed the fair market value of Husband's 50% share as $75,148.

Husband's expert excluded goodwill from his analysis. He noted that goodwill has two components — professional and practice goodwill. He defined "professional goodwill ... [a]s that intangible value which is created by and associated with the individual [orthodontist]." In his opinion, professional goodwill is personal to the holder of it and has no exchange value in the open market separate from the holder.

According to Husband's expert, practice goodwill, on the other hand, "is that intangible value which is created by and attributable to the excess earnings capacity associated directly with the Practice as a business entity, as opposed to the value of any individual [orthodontist]'s reputation." Because the Agreement specifically excludes practice goodwill from the valuation formula, Husband's expert excluded it from his analysis as well.

Wife argues first that the trial court erroneously relied upon Husband's expert's valuation because it was based exclusively upon the Agreement. Relying upon *Drake v. Drake*, 809 S.W.2d 710, 713 (Ky. Ct. App. 1991), she argues that "the majority position on this issue" is that a buy-sell agreement for a closely held corporation which provides a method for setting value on its shares for purposes of distribution is not binding; rather, it is to be weighed with other factors in determining value. She contends that, by relying upon Husband's expert's valuation, the trial court erroneously found the buy-out provision in the Agreement to be conclusive for valuation purposes.

We do not share Wife's interpretation of the trial court's ruling. Neither the trial court nor Husband's expert opined that the Agreement's buy-out provision was "conclusive." Husband's expert asserted that the Agreement was the "single most important factor influencing the fair market value," not that it was "conclusive" as to fair market value. Husband's expert relied upon information in addition to the Agreement to determine the practice's fair market value, such as the corporate tax returns of the practice for the tax years 1995 through 1999, "various internal bookkeeping and revenue summaries [and] information concerning personnel and job responsibilities."

The trial court did not rely only upon Husband's expert's valuation in determining Husband's interest in the practice. *See In the Matter of Letendre & Letendre,* 149 N.H. 31, 38 (2002). The court heard testimony from both parties' experts and received documentation, including corporate tax returns and financial statements. *See id.*

As in *Letendre,* the trial court could have found the price calculated pursuant to the buy-out provision "particularly reliable" because it was based upon current values. *See id.* The Agreement "provides a formula of sorts for ascertaining a *current* monetary value. . . . In other words, upon departure, a [shareholder] would realize monetary worth which bore some relation to the firm's current accounts." *Butler v. Butler,* 663 A.2d 148, 153 (Pa. 1995). Because the substantive rights of the shareholders consist only of those specified in the Agreement, the trial court committed no error by viewing it as the preeminent factor in estimating the fair market value of those rights. *See McCabe v. McCabe,* 575 A.2d 87, 89 (Pa. 1999).

Wife next argues that the trial court's valuation was erroneous as a matter of law because, by crediting Husband's expert's report, the trial court failed to calculate a value for goodwill. She observes that "the vast majority of courts which have ruled on the question" have held that the goodwill of a practice is property of value which should be included in the amount of assets distributed upon the dissolution of marriage. *Poore v. Poore,* 331 S.E.2d 266, 271 (N.C. Ct. App. 1985).

We decline to rule as a matter of law that when assessing the value of a professional practice, the trial court must always calculate a value for goodwill. The valuation of a professional practice is a question of fact, not a question of law. *See In re Marriage of Huff,* 834 P.2d 244, 255 (Colo. 1992). The determination of the existence and value of goodwill is also a question of fact, not law. *Poore,* 331 S.E.2d at 271; *In re Marriage of Hall,* 692 P.2d 175, 180 (Wash. 1984). As Wife's expert conceded, "[T]here is no single best approach to valuing a professional association or practice." *Poore,* 331 S.E.2d at 270. Valuation of each individual practice depends on its particular facts and circumstances. *Id.* We will not disturb the trial court's findings in this regard unless they are unsustainable on the record. *See Crowe,* 148 N.H. at 221.

We conclude that the trial court's exercise of discretion in crediting the Husband's expert's valuation over the Wife's expert's valuation was sustainable. *See In the Matter of Gordon and Gordon,* 147 N.H. 693, 695-96 (2002). The trial court could have reasonably determined that it was inappropriate to place a value on the goodwill of the practice where the Agreement does not require Husband to execute a covenant not to compete upon sale of stock. "Apart from a negotiated non-competition

agreement, ... Husband would be free to compete by opening an office down the street." *Theilen v. Theilen,* 847 S.W.2d 116, 121 (Mo. Ct. App. 1992). Under these circumstances, the trial court reasonably could have concluded that it was "doubtful any purchaser would pay for any intangible factors in order to purchase Husband's interest." *Id.*

■ The trial court also could have reasonably decided to disregard the valuation by Wife's expert because it failed to consider the restrictions set forth in the Agreement. *Cf. Rattee,* 146 N.H. at 50-51. Although there is "no uniform rule for valuing stock in closely held corporations," *In re Marriage of DeCosse,* 936 P.2d 821, 825 (Mont. 1997) (quotation omitted), "[w]hatever method is used ... must take into consideration inhibitions on the transfer of the corporate interest resulting from a limited market or contractual provisions," *Amodio v. Amodio,* 509 N.E.2d 936, 936-37 (N.Y. 1987). When an expert fails to consider the restrictions set forth in the shareholder agreement of a closely-held corporation, the trial court may properly disregard the expert's opinion and rely upon the stock price value set forth in the shareholder agreement as evidence of the corporation's actual value. *See Decosse,* 936 P.2d at 825; *Amodio,* 509 N.E.2d at 937.

### B. Pension and Profit-Sharing

While acknowledging that the trial court has "wide discretion in determining the date on which a value should be placed on marital assets," *Gordon,* 147 N.H. at 696 (quotation omitted), Wife argues that by valuing Husband's pension and profit-sharing accounts as of September 30, 2001, the court accepted "artificially low values" for these accounts. Wife does not provide an alternative valuation date, but argues instead that the trial court should have distributed both of these assets "in kind" between the two parties.

■ Courts are free to exercise their sound discretion to establish an appropriate valuation date for the equitable distribution of marital assets. *Hillebrand v. Hillebrand,* 130 N.H. 520, 524 (1988). The trial court's decision to value Husband's pension and profit-sharing accounts as of September 30, 2001, the last date of the most recently ended fiscal year for the orthodontic practice, is sustainable.

Wife argues that because the profit-sharing and pension accounts each suffered sudden and unexpected diminution in value following the terrorist attacks on September 11, 2001, dividing the accounts between the parties would have been "more appropriate." We disagree. A trial court has "no duty to divide each asset equally"; rather, its only responsibility is to "look at the assets as a whole and propose an equitable distribution" of them. *Dombrowski v. Dombrowski,* 131 N.H. 654, 660 (1989). In this case, the

trial court determined that an equal division of assets was equitable and, rather than dividing each asset in half, the court awarded each spouse assets with comparable value. Thus, for instance, while Husband received the full value of his pension and profit-sharing accounts, Wife received the full value of the marital home. We fail to see how it would have been "more appropriate" for the trial court to have awarded Wife one-half of Husband's pension and profit-sharing accounts rather than assets of equivalent value.

Wife's reliance upon *Hodgins v. Hodgins*, 126 N.H. 711, 715-16 (1985) (superseded on other grounds by RSA 458:16-a, I (1992)), is misplaced. *Hodgins* does not require division of a pension account, when, as here, the value of that account is ascertainable. *Id.* at 715. In *Hodgins*, "we established a formula for equitably apportioning pension benefits when the actual and contingent values are unascertainable." *In the Matter of Sutton & Sutton*, 148 N.H. 676, 680-81 (2002). Accordingly, the *Hodgins* formula calculates a percentage to be paid to an employee's former spouse by dividing the number of months the employee was employed during the marriage and prior to the commencement of the divorce by the total number of credits the employee will have earned toward the pension as of the date benefits commence and awarding half of this amount to each spouse. *See Hodgins*, 126 N.H. at 716.

The *Hodgins* formula is designed to help trial courts avoid "the problem of valuation" when the value of the pension "is, by its nature, impossible to determine at the time of divorce." *Rothbart v. Rothbart*, 141 N.H. 71, 74 (1996) (quotation omitted). The formula does not apply when the value of the pension is ascertainable.

Husband's pension was a defined contribution plan, not a defined benefit plan. "A defined contribution pension is essentially an annuity funded by periodic contributions and the interest therefrom. At the employee's retirement, the accumulated funds purchase an annuity for the remainder of the employee's life . . . ." G. SKOLOFF ET AL., *supra* § 23.02[1][b]. Unlike the value of a defined benefit plan, which may be speculative, "[a] defined contribution pension always has an ascertainable cash value, whether or not it currently can be reached by the employee." *Id.* Thus, in this case, there was no need for the trial court to resort to the *Hodgins* formula to ascertain the actual value of Husband's pension account.

### C. Overall Distribution

Wife asserts that the court's distribution of assets, while ostensibly equal, was inequitable. She argues that she was entitled to receive a larger portion of the parties' assets than Husband received. We uphold the trial court's determination that an equal distribution was equitable.

"RSA 458:16-a, II . . . creates a presumption that equal distribution of marital property is equitable." *Hoffman v. Hoffman*, 143 N.H. 514, 520 (1999). Absent special circumstances, the court must make the distribution as equal as it can. *See id.* "The statute enumerates various factors for the court to consider, such as the length of the marriage, the ability of the parties to provide for their own needs, the needs of the custodial parent, the contribution of each party during the marriage and the value of property contributed by each party." *Crowe*, 148 N.H. at 221; *see* RSA 458:16-a, II (Supp. 2002). The court need not consider all of the enumerated factors or give them equal weight. *See Crowe*, 148 N.H. at 221.

■ The trial court considered the statutorily enumerated factors and determined that an equal distribution of assets was equitable. The record supports the trial court's determination. The parties were married for more than fifteen years. Both are college educated with significant job skills. Wife supported Husband by maintaining the marital home and raising the parties' children. Husband supported Wife financially, enabling her to stay at home with the parties' children. Neither party alleged fault in the breakdown of the marriage. Under these circumstances, we cannot say that an equal division of assets was so inequitable as to constitute an unsustainable exercise of discretion. *See id.* at 221-22.

■ Wife further argues that the court failed to specify written reasons for its distribution of the parties' property. To the contrary, in addition to issuing two narrative orders, the trial court ruled upon over 200 requests for findings and rulings, which adequately support its order. *See In the Matter of Valence and Valence*, 147 N.H. 663, 669-70 (2002).

Because Wife did not brief the remaining issue raised in her notice of appeal, we deem it waived. *See Herman v. Monadnock PR-24 Training Council*, 147 N.H. 754, 758 (2002).

*Affirmed in part; vacated in part; and remanded.*

BROCK, C.J., and BRODERICK, NADEAU and DUGGAN, JJ., concurred.