Sullivan
No. 2005-128

IN THE MATTER OF MARCUS J. HAMPERS AND KRISTIN C. HAMPERS

Argued: June 7, 2006
Opinion Issued: November 1, 2006

*Orr & Reno, P.A.,* of Concord (*James P. Bassett* and *Judith A. Fairclough* on the brief, and *Mr. Bassett* orally), for the petitioner.

*Wiggin & Nourie, P.A.,* of Manchester (*Doreen F. Connor* on the brief and orally), for the respondent.

DALIANIS, J. The petitioner, Marcus J. Hampers, appeals from a final divorce decree approved by the Superior Court (*Brennan,* J.). We affirm in part, vacate in part and remand.

## I. Background

The record supports the following. The petitioner and the respondent, Kristin C. Hampers, married in September 1998 and had one child in August 2000. The petitioner sought a legal separation in May 2002. In June 2002, he amended his petition to seek a divorce, alleging that irreconcilable differences caused "the irremediable breakdown of the marriage." Thereafter, the respondent filed a cross-petition for divorce, alleging the fault ground of conduct "to injure health or endanger reason." RSA 458:7, V (2004). In November 2002, the parties entered into a temporary stipulation that awarded them shared physical custody of their child.

The trial occurred over seventeen days in May, June and September 2004. On December 1, 2004, the trial court dismissed the petitioner's petition and granted the respondent's cross-petition, finding that the petitioner's conduct "injured [the respondent's] health and endangered her reason and was the substantial cause of the breakdown of the marriage." Specifically, the court found that the petitioner made threats to the respondent on July 24, 2002, which "were a substantial cause of [the respondent's] emotional and psychological problems[,] which resulted in her temporary loss of custody of [the parties' child] later in August 2002 [and] . . . marked the irremediable breakdown of the marriage."

The final decree ordered an unequal division of assets with the petitioner receiving substantially more assets than the respondent. In addition to other assets, the decree awarded to the petitioner the marital home (worth approximately $1 million) and the approximately $15 million in assets in his revocable trust; it awarded the respondent over $2 million in assets.

The decree awarded the parties joint legal custody and the respondent primary physical custody of the child. It required the petitioner to pay the respondent $6,599 in monthly child support.

Additionally, the decree awarded the respondent $2,500 in monthly alimony. The court ordered the petitioner to pay alimony from December 1, 2004, until August 1, 2018, at which time the court would review "the question of alimony." The decree also required the petitioner to pay the respondent's past, present and future attorney's fees and costs, guardian ad litem fees, and court-ordered mediator/arbitrator fees.

On appeal, the petitioner argues that the trial court erred when it: (1) granted a fault divorce pursuant to RSA 458:7, V; (2) reduced his custodial time from that provided in the parties' temporary stipulation; (3) calculated his income for child support purposes; (4) awarded the respondent alimony of $2,500 per month for approximately thirteen years; (5) awarded the respondent over $2 million in property distribution and considered "economic parity" as a factor in that property distribution; (6) ordered him to pay the respondent $500,000 of the property distribution in the event of an appeal; and (7) required him to pay the respondent's attorney's fees. We address these arguments in turn.

## II. Issues on Appeal

### A. Grounds for Divorce

The petitioner first argues that the trial court erred by granting the respondent's cross-petition for a fault-based divorce because "[t]he overwhelming weight of the evidence compels a finding that the primary

cause of the breakdown of the marriage was long-time incompatibility, and that the irremediable breakdown occurred before July[] 2002." Whether the irremediable breakdown of the marriage was caused by irreconcilable differences or the petitioner's misconduct was a factual question for the trial court. *See Yergeau v. Yergeau*, 132 N.H. 659, 661 (1990). We will affirm the trial court's factual findings unless the evidence does not support them or they are legally erroneous. *In the Matter of Preston and Preston*, 147 N.H. 48, 49 (2001).

■ Although the record supports a finding that "the primary cause of the breakdown was incompatibility," it also supports a finding that the breakdown caused by the parties' incompatibility was not irremediable. *Yergeau*, 132 N.H. at 662. There was evidence that the respondent desired to continue the marriage and that, therefore, there was a reasonable possibility of reconciliation. *Id.* Under such circumstances, it was fitting "for the court to find the subsequent fault [of the petitioner] to be the primary cause of the ultimate marital breakdown and to decree a divorce accordingly." *Id.*

The testimony of both parties supported a finding that, although they were incompatible, reconciliation was possible up until their July 24, 2002 argument. The petitioner testified that in May and June 2002, he told the respondent that, although he believed that there was a "70 percent chance that we were going to end in divorce," there was "a slim chance of reconciliation." The respondent testified that she did not conclude that the marriage was unsalvageable until the petitioner began threatening her and she became afraid for her physical safety. Even after the petitioner sought a legal separation, the respondent "didn't know what was going on" with the parties' marriage. The respondent testified that, as of June 2002, although she felt emotionally isolated in her marriage, she was willing to remain married for the sake of her son. As she testified: "I was trying everything I could so that when I talked to my son some day, that I could tell him that I did everything possible to prevent what has happened." It was not until the respondent realized that her life and her son's life were "compromised in terms of our safety" that her view changed.

From this evidence, the trial court was entitled to conclude that "the [respondent's] determination was enough to preserve the possibility of reconciliation" even after the petition for a legal separation was filed in May 2002, and that it was only the petitioner's subsequent threats to the respondent "that defeated that possibility, and, with it, finally destroyed the marriage itself." *Id.* at 662-63.

Alternatively, the petitioner contends that he was unable to prove that the marriage had irremediably broken down before July 24, 2002, because

the respondent failed to disclose many medical and counseling records and expert reports, and produced others late. We review a trial court's decision on the management of discovery and the admissibility of evidence under an unsustainable exercise of discretion standard. *Figlioli v. R.J. Moreau Cos.*, 151 N.H. 618, 626 (2005). To meet this standard, the petitioner must demonstrate that the trial court's ruling was clearly untenable or unreasonable to the prejudice of his case. *Id.*

The record does not support the petitioner's contentions. Indeed, the record shows that, consistent with its obligation to protect the privileged nature of the records the petitioner sought, the court reviewed them *in camera* and, following its review, released those records it deemed relevant. *See Desclos v. S. N.H. Med. Ctr.*, 153 N.H. 607 (2006). The record further demonstrates that the court found that the records that were produced late "consist of two or three sentences, or observations by the therapist made subsequent to the meeting." The court observed that the records were not "all that complicated" and were not "substantially different from other records" the court had reviewed. The court ultimately found that the petitioner was not prejudiced by the late release of the records. Nevertheless, the court permitted the petitioner's expert to provide rebuttal testimony and a rebuttal report in September 2004 to challenge the testimony provided by the respondent's experts. "[O]n the record before us and given the broad discretion afforded the trial court in managing and supervising discovery and ruling on the conduct of the trial, we find no error." *Murray v. Developmental Servs. of Sullivan County*, 149 N.H. 264, 268 (2003).

### B. Child Custody

We next address whether the trial court erred by reducing the petitioner's custodial time from that set forth in the parties' temporary stipulation. The temporary stipulation provided that the parties' child would "be with each party on an equal basis." Under the stipulation, the parties alternated having three and four days per week with the child.

The final decree awarded the parties shared physical custody of their child and designated the respondent as the child's "primary physical custodian." According to the petitioner, the final decree awarded him physical custody of the child thirteen days in a thirty-one-day month, while the temporary stipulation awarded him physical custody of the child fifteen days in a thirty-one-day month. The final decree further provided for a change in the custody schedule when the parties' child attends school full-time. According to the petitioner, pursuant to this changed schedule, he will have physical custody of the child ten days in a thirty-one-day month.

The petitioner argues that changing the custodial schedule from that set forth in the temporary stipulation constituted an unsustainable exercise of discretion because doing so was contrary to the recommendations of the experts retained by the guardian ad litem (GAL). Although he concedes that "the trial court is not required to give presumptive weight to the GAL's recommendation," he contends that "it is an unsustainable exercise of discretion for the court to have rejected the GAL and the experts' custody recommendations, while offering no explanation for the modified custodial schedule set forth in the Decree." *See Richelson v. Richelson*, 130 N.H. 137, 144 (1987).

█ This argument is without merit. When determining matters of custody and visitation, a trial court's overriding concern is the best interest of the child. *In the Matter of Kosek & Kosek*, 151 N.H. 722, 725 (2005). In doing so, the trial court has wide discretion, and we will not overturn its determination except where there has been an unsustainable exercise of discretion. *Id.* at 724. This means that we review the record only to determine whether it contains an objective basis to sustain the trial court's discretionary judgment. *In the Matter of Lockaby & Smith*, 148 N.H. 462, 465 (2002). "The trial court's determination in any custody case depends to a large extent upon a firsthand assessment of the credibility of witnesses, as well as the character and temperament of the parents, and the findings of the trial court are binding upon this court if supported by the evidence." *Webb v. Knudson*, 133 N.H. 665, 671 (1990).

There is evidence in the record to support the trial court's custody schedule. This evidence includes the recommendation of the GAL and the experts she retained that the respondent should continue to be the child's primary physical custodian. As the GAL observed:

> [S]ince the parties are unable to communicate and make joint decisions, shared custody is not appropriate at this time, and it is in [the child's] best interest that a primary custodian be designated. . . . The GAL is recommending that [the respondent] be awarded primary physical custody of [the child] for several reasons. It is undisputed that prior to the institution of this case, . . . [the respondent] was [the child's] primary caregiver and that she spent the majority of her time with her son when she was not working . . . . It is reported that she was an excellent and devoted caregiver to him. It is further reported . . . that [the petitioner] was seldom present . . . . It is apparent to the GAL that the parties are not able to permanently share physical custody of [the child] as evidenced by their continued inability to work together during the past year and one-half of sharing custody on a

temporary basis. Therefore, without other compelling reasons for an award of physical custody to [the petitioner], [the respondent's] role as [the child's] major source of support and care should continue.

The experts retained by the GAL echoed these sentiments in their trial testimony. As one of these experts testified, they recommended that there be a primary physical custodian of the child and that this custodian be the respondent because they believed that she was better suited for that role than the petitioner.

The evidence further included the GAL's concern about the custodial schedule set forth in the temporary decree, as well as the testimony of the respondent's custody expert that the temporary schedule involved too many transitions, which were difficult for the child. As the respondent's expert observed, the custody schedule that was previously in place had "far too many transitions for a three-year-old, soon to be four-year old child." He explained, "once children get beyond two or three years of age, ... it's better to have longer blocks of time and less transitions than this many transitions." Lessening the number of transitions helps the child to develop a sense of security. Ultimately, the respondent's expert stated that he "[could not] support any schedule that has eight or nine transitions in a two-week period of time."

Moreover, the evidence included the testimony of one of the experts hired by the GAL that the reason the experts recommended that the schedule set forth in the temporary stipulation remain in place was to accommodate the parties' work schedules. This expert testified that if the respondent's work schedule changed so that she only worked Tuesdays and Fridays, the expert would support having the child be with the respondent on Thursdays to reduce the number of transitions for the child and because the experts "believe that what [the respondent does] with [the child] is beneficial to [him]."

 As there is evidence in the record to support the trial court's custody schedule, we cannot say that the court's exercise of discretion was unsustainable.

### C. Child Support

We next review whether the trial court unsustainably exercised its discretion by ordering the petitioner to pay $6,599 in monthly child support. The petitioner argues that the trial court improperly calculated his income.

The trial court defined the petitioner's income as "his employment income plus one-half of all interest, taxable or tax-exempt, dividends,

capital gains, or other income to which he is legally entitled whether he chooses to actually receive it annually as reported on []his tax return." The trial court included in the petitioner's income one-half of the trust income he receives.

We will uphold the trial court's decision with respect to child support unless it is unsupported by the evidence or tainted by an error of law. *In the Matter of Coderre & Coderre*, 148 N.H. 401, 403 (2002).

On appeal, the petitioner does not challenge the trial court's definition of income for child support purposes, but rather the trial court's failure to apply it properly. He asserts that there is no evidence to support the figure the court used for his monthly gross income, $39,939. The petitioner observes that this monthly gross income figure came from the respondent's child support guidelines worksheet. The respondent, in effect, concedes that the record does not support the $39,939 figure. She asserts that when "50% of [the petitioner's] monthly income from non-employment ... [is] combined with his $14,556 Dartmouth monthly income," the income figure generated is "between $38,681 and $38,822." As the trial court accepted the monthly gross income figure the respondent included in her child support guidelines worksheet and as the petitioner has demonstrated that the record does not support this figure, we conclude that its child support order constituted an unsustainable exercise of discretion and we vacate it.

## D. Alimony

We next review the trial court's alimony award. RSA 458:19, I (Supp. 2005) authorizes the trial court to award alimony if: (1) the party in need lacks sufficient income, property, or both to provide for his or her reasonable needs, considering the style of living to which the parties have become accustomed during the marriage; (2) the payor is able to continue to meet his or her own reasonable needs, considering the style of living to which the parties have become accustomed during the marriage; and (3) the party in need cannot be self-supporting through appropriate employment at a standard of living that meets reasonable needs, or is the custodian of the parties' child, whose condition or circumstances make it appropriate that the custodian not seek employment outside the home.

We review the trial court's decision to grant or deny a request for alimony under our unsustainable exercise of discretion standard. *In the Matter of Gronvaldt & Gronvaldt*, 150 N.H. 551, 554 (2004).

The petitioner challenges the amount of alimony awarded ($2,500 monthly) and the duration of the award (approximately thirteen years). He

contends that the amount is excessive given the respondent's level of education and the substantial property distribution that she received, as well as the trial court's findings that the marriage was "short term" and that the parties' standard of living was not lavish. He also argues that no circumstances support a long-term alimony award, *see In the Matter of Fowler & Fowler*, 145 N.H. 516, 520 (2000), and that the trial court "failed to explain the basis for the 13 year duration of the alimony award." We disagree.

█ In determining the amount of alimony, a trial court must consider: the length of the marriage; the age, health, social or economic status, occupation, amount and sources of income, the property awarded under RSA 458:16-a (2004), vocational skills, employability, estate, liabilities, and needs of each of the parties; the opportunity of each for future acquisition of capital assets and income; the fault of either party as defined in RSA 458:16-a, II; and the federal tax consequences of the order. RSA 458:19, IV(b). Further, the court may consider the economic contribution of each party to the value of their respective estates, as well as non-economic contributions to the family unit. *See* RSA 458:19, IV(d).

█ The record shows that the trial court considered these factors in fashioning the alimony award. Specifically, the court found that the parties had a "short term" marriage. The court found that the respondent works part-time as a physician assistant and that her annual salary is approximately $35,000, while the petitioner works as a full-time emergency room physician and that his annual salary is approximately $166,000. The court further found that the assets of his revocable trust have an approximate value of $15.5 million. Based upon these factors and the evidence supporting them, we cannot say that the trial court unsustainably exercised its discretion by ordering the petitioner to pay monthly alimony of $2,500.

█ With respect to the duration of the alimony award, the court ordered the petitioner to continue paying alimony until the child reaches eighteen, at which time the court would review whether continuing alimony beyond that time was appropriate. In making this award, the court specifically found that while the respondent was relatively young (thirty-seven), a college graduate with a post-graduate certificate as a physician assistant, and capable of being employed full-time, it was in the child's best interests for her to continue working part-time. The court found that the flexibility of the respondent's part-time employment allowed her to avoid using nannies and other caregivers and that there is a need to limit the number of third parties providing care to the child. The court's finding with respect

to the need for the respondent to continue working part-time has support in the evidence. The experts hired by the GAL testified, for instance, that they recommended a plan that would maximize the time that each party has off work to spend with the child.

### E. Property Distribution

#### 1. Equitable Division

Next, we review the petitioner's contention that the trial court unsustainably exercised its discretion by awarding the respondent more than $2 million in property distribution. The trial court unequally divided the marital estate in favor of the petitioner. It awarded the respondent $2 million in addition to her personal property, bank accounts and vehicle and awarded the petitioner the marital homestead (worth approximately $1 million) and the assets in his revocable trust (valued at approximately $15 million) in addition to his personal property, bank accounts, numerous cars, the boat, tractor, snowmobile and all-terrain vehicle.

"RSA 458:16-a, II creates a presumption that equal distribution of marital property is equitable." *In the Matter of Watterworth & Watterworth*, 149 N.H. 442, 453 (2003) (quotation and ellipsis omitted). Absent special circumstances, the court must make the distribution as equal as possible. *Id.*

"The statute enumerates various factors for the court to consider, such as the length of the marriage, the ability of the parties to provide for their own needs, the needs of the custodial parent, the contribution of each party during the marriage and the value of property contributed by each party." *In the Matter of Crowe & Crowe*, 148 N.H. 218, 221 (2002); *see* RSA 458:16-a, II (2004). Additionally, the court may consider "[a]ny other factor [it] deems relevant" in equitably distributing the parties' assets. RSA 458:16-a, II(o). A trial court is not precluded, however, from awarding a particular asset in its entirety to one party. *See In the Matter of Letendre & Letendre*, 149 N.H. 31, 36 (2002).

As we afford trial courts broad discretion in determining matters of property distribution in fashioning a final divorce decree, we will not overturn the trial court's decision absent an unsustainable exercise of discretion. *Crowe*, 148 N.H. at 221. "If the court's findings can reasonably be made on the evidence presented, they will stand." *Letendre*, 149 N.H. at 36.

The petitioner argues that the trial court should have awarded him more assets than it did because the parties had a short-term marriage, he brought substantial assets into the marriage and was primarily

responsible for the growth of those assets during the marriage. He asserts that when there is a short-term marriage, the trial court is obligated to leave the parties in no worse position than they were in before marriage. Because he is in a worse position financially than he was before marriage, he contends that the court erred.

■ The petitioner is mistaken. While it may be proper, in some cases, to treat a short-term marriage differently from a long-term marriage, in other cases, it may not. *See Rahn v. Rahn*, 123 N.H. 222, 225-26 (1983). The trial court's statutory obligation is to apportion the property *equitably*. "In a divorce proceeding, marital property is not to be divided by some mechanical formula but in a manner deemed 'just' based upon the evidence presented and the equities of the case." *Letendre*, 149 N.H. at 35. The duration of a marriage is but one of the factors for a court to consider when equitably dividing the parties' property. *See Crowe*, 148 N.H. at 221. The court need not consider all of the enumerated factors or give them equal weight. *Watterworth*, 149 N.H. at 453.

The record shows that the trial court considered the statutory factors in dividing the parties' assets, including the factors the petitioner identifies. *See* RSA 458:16-a, II(b)-(d), (f)-(h), (l), (o). The record also supports the trial court's factual findings based upon these statutory factors.

■ The petitioner next argues that the trial court erred when it considered maintaining economic parity between the parties' respective households as a factor in fashioning its property distribution. The trial court found that: "Equity requires providing Respondent with financial resources sufficient to maintain parity between the parties' respective households . . . because Petitioner's superior wealth serves as a means by which Petitioner may exert control over Respondent to the detriment of [the child]." The petitioner contends that the trial court's concern with household parity is not permitted under New Hampshire law. To the contrary, RSA 458:16-a, II(o) specifically permits the trial court to consider "[a]ny other factor [it] deems relevant" in equitably distributing the parties' assets. Under the circumstances of this case, we cannot say that the trial court erred when it made findings about economic parity when fashioning its equitable division of assets.

As the trial court's decision is supported by the record and as the petitioner has failed to persuade us that the trial court committed an error of law, we hold that its division of property was a sustainable exercise of discretion.

## 2. Advance distribution

We next review the petitioner's assertion that the trial court erred when it ordered him to pay a $500,000 property advance to the respondent in the event of an appeal. The trial court's order stated that this advance was a "further temporary order . . . , the primary purpose of which will be to permit [the respondent] to obtain suitable housing for herself [and the parties' child]." The petitioner challenges this order on two grounds. First, he contends that it violated his constitutional rights to due process. Second, he asserts that the trial court lacked the authority to order him to pay an advance to the respondent absent any concern that, without such an order, he would dissipate assets.

We decline to consider the petitioner's constitutional arguments because he has failed to demonstrate that he preserved them for our review. It is a long-standing rule that parties may not have judicial review of matters not raised in the forum of trial. *N. Country Envtl. Servs. v. Town of Bethlehem*, 150 N.H. 606, 619 (2004); *see also State v. Dellorfano*, 128 N.H. 628, 632 (1986). As the appealing party, the petitioner has the burden, not only of providing a record sufficient for our review, but also of demonstrating that he raised his issues in the trial court. *See Bean v. Red Oak Prop. Mgmt.*, 151 N.H. 248, 250 (2004). Here, the petitioner did not raise a constitutional argument in either his motion for reconsideration to the trial court or his later motion to the trial court to stay the final decree pending appeal. Because the petitioner has failed to demonstrate that he raised his due process arguments to the trial court, we decline to review them on appeal.

We therefore confine our review to the petitioner's assertion that the court lacked the authority to order him to pay the respondent an advance absent evidence that it was concerned that he would dissipate assets. In *In the Matter of Nyhan & Nyhan*, 151 N.H. 739, 745-46 (2005), we upheld a trial court's order requiring the respondent in that divorce case to pay the petitioner $2,600,000 within ten days of the clerk's notice of the trial court's order following remand. In that case, the court ordered the respondent to make this payment to prevent him from further dissipating assets. *Nyhan*, 151 N.H. at 746. The petitioner argues, in effect, that *Nyhan* should be limited to its facts. We disagree.

As in *Nyhan*, we conclude that the trial court's order in this case is in accord with our case law regarding property distributions. *Id.* at 745. In *Nyhan*, we recognized that even when an appeal has been taken, the trial court has the authority and jurisdiction to "make such orders and decrees as may be necessary for the protection and preservation of the subject matter of the appeal" and to "preserve the status quo." *Id.* (quotations

omitted). We further recognized that, in the context of alimony and child support, the trial court is in the best position to assess the parties' circumstances during an appeal and to fashion its order accordingly. *Id.* at 745-46. Applying these principles to the unique circumstances present here, we conclude that the trial court did not err by requiring the petitioner to pay the respondent $500,000 in the event of an appeal to permit her to secure suitable housing for her and the parties' child. By requiring the petitioner to pay the respondent this advance, the court was, in effect, preserving the status quo that had been in effect before the petitioner manipulated events to obtain the exclusive use of the marital home and temporary physical custody of the parties' child.

The record shows that, in its initial temporary order, the trial court awarded the respondent "sole and exclusive use and possession of the former marital homestead." In that order, the court also awarded the respondent primary physical custody of the parties' child. The record further shows that the day after the court issued this temporary order, the petitioner brought an *ex parte* motion for immediate change of custody. In this motion, the petitioner alleged that the respondent's mental condition had deteriorated to the point that she was unable to care for the parties' son. The record further supports a finding that while the petitioner may have been motivated by genuine concern for his son, as the experts hired by the GAL reported, his *ex parte* motion "also suggested some opportunism on his part." As the GAL noted in her report, she was "concerned that at the inception of this case, when ... a friend of [the respondent's] contacted [the petitioner] about her concerns regarding [the respondent's] mental status, her intentions were to obtain assistance for [the respondent], not to put in motion [the respondent's] loss of custody of [the child]." According to the friend, at the time, "[the petitioner] promised that he would never take [the child] from [the respondent] because he did not want custody as he was too busy and ... [the respondent] was the best mother a boy could have." Nonetheless, he moved *ex parte* for a change in custody.

Based upon the allegations in the petitioner's motion, the court awarded the petitioner temporary physical custody of the parties' son and ordered the respondent to "make alternative suitable housing arrangements within 45 days, after which [the petitioner] is awarded temporary use of the parties' homestead." In approximately November 2002, the parties agreed to share physical custody of the child again, although the petitioner was again awarded temporary and exclusive use and possession of the marital home.

We conclude that, based upon the above, the trial court reasonably could have decided that the $500,000 advance was necessary to preserve the

status quo that had been in effect before the petitioner obtained the exclusive use of the marital home and temporary physical custody of the parties' child.

### F. Attorney's Fees

Finally, we consider the petitioner's assertion that the trial court erred when it awarded attorney's fees to the respondent.

In its temporary order, the trial court required the petitioner to pay the respondent $10,000 towards her attorney's fees and further ordered him to make additional payments as requested when accompanied by verification that she had paid or would pay attorney's fees in the near future. The court stated that its order was "to assist the respondent with the cash flow necessary to pay attorney's fees." The court stated that it was *not* awarding the respondent attorney's fees and that it made "no finding as to either the necessity or the reasonableness of the fees sought by the respondent." It deferred that issue to the final hearing, at which time the respondent could seek recovery of said fees by retaining what the petitioner had already paid as part of the final property distribution and the petitioner could seek adjustment to the final property distribution based upon said fees.

In the final decree, the court ordered the petitioner to pay all of the respondent's attorney's fees incurred in the case "within 30 days of receipt of a statement from [the respondent's] attorney." The court stated that, in the event of an appeal, the petitioner was obligated to continue paying the respondent's attorney's fees as set forth in the court's temporary order.

The court further ordered the petitioner to pay all of the respondent's "reasonable attorney['s] fees . . . for any proceeding or any other matter relating to any term of this decree and any amendment thereto or to [the child] in this matter in the future" within thirty days of his receipt of the respondent's attorney's fee statement.

In making this award, the trial court denied the petitioner's request for a finding that if the respondent's reasonable fees and costs "exceed the property award, . . . it would be equitable to reduce her property award to $0 and not require her to repay [the petitioner] for her remaining share of the fees and costs." The court found specifically that "it would not be equitable for [the respondent] to pay fees and costs."

 "An award of attorney's fees must be grounded upon statutory authorization, a court rule, an agreement between the parties, or an established exception to the rule that each party is responsible for paying his or her own counsel fees." *LaMontagne Builders v. Brooks*, 154 N.H. 252, 259 (2006). We have previously recognized that an exception may exist

in divorce cases. *DePalantino v. DePalantino*, 139 N.H. 522, 526 (1995). In such cases, the trial court has the discretion to award a party attorney's fees when "the trial court has found need on the part of one party and ability to pay on the part of the other." *Id.* (quotation omitted). We review the trial court's award of attorney's fees under our unsustainable exercise of discretion standard. *Anderson v. Smith*, 150 N.H. 788, 794 (2004).

The petitioner first contends that we must vacate the attorney's fee award because the court failed to offer a rationale for it. Although the court observed that it was necessary to require the petitioner to pay the respondent's future attorney's fees to "prevent abuse of this justice system," the trial court did not otherwise articulate its reasons for its attorney's fee award. Because there are no statutory claims or any indication that the parties agreed to such an award, we infer that the court found that the exception in divorce cases applied to this case. *See Miami Subs Corp. v. Murray Family Trust and Kenneth Dash Partnership*, 142 N.H. 501, 518 (1997).

The petitioner next asserts that, to the extent that the court applied the exception permitting an award of attorney's fees in a divorce, the court erred because it "failed to make any determination as to need or ability to pay." Although the trial court made no explicit findings with respect to the respondent's need and the petitioner's ability to pay, its order necessarily implied such findings. *See Salito v. Salito*, 107 N.H. 77, 78 (1966); *see also Kosek*, 151 N.H. at 725 (noting that appellate court assumes that trial court made all subsidiary findings necessary to support its general ruling). The record supports these implied findings.

The petitioner next argues that the award of attorney's fees incurred before appeal must be vacated "because the court failed to comply with . . . *Gosselin v. Gosselin*, 136 N.H. 350 (1992)." In *Gosselin*, 136 N.H. at 353, we held that before a court may award attorney's fees, it "must determine [the] reasonableness of the attorney's fees and, in order to do so, must have some evidence of the services performed, the time involved and the fee arrangement." The petitioner contends that the trial court erred by requiring him to pay all of the respondent's attorney's fees without first determining whether the fees were reasonable and examining some evidence of the services performed, the time involved and the fee arrangement. The respondent counters that the petitioner did not preserve this issue for appeal because he did not raise it until after the court issued the final decree.

We disagree with the respondent that the petitioner failed to preserve this issue for our review. The trial court made clear in its temporary order that it was not making an award of attorney's fees. The court did not

award the respondent attorney's fees until the final decree. The petitioner's motion for reconsideration filed after the final decree therefore was sufficient to preserve his *Gosselin* argument for our review. *See N.H. Dep't of Corrections v. Butland*, 147 N.H. 676, 679 (2002).

With respect to the attorney's fees incurred by the respondent, which the petitioner paid as required by the court's temporary decree, we agree with the respondent that these fees are in the nature of a property award, rather than an attorney's fee award. By permitting the respondent to retain the sums paid by the petitioner for her attorney's fees, the court made these fees part of the final property distribution. The petitioner appears to concede this point in his brief when he states that the respondent received "a property award of approximately $2.5 million, including the award of fees and costs." Accordingly, because these fees are part of the property distribution, the procedure we set forth in *Gosselin* does not apply to fees the petitioner has already paid.

We hold, however, that the *Gosselin* procedure does apply to the attorney's fees the respondent has already incurred, but the petitioner has not yet paid. To the extent that the trial court has not complied with the procedure we set forth in *Gosselin* with respect to those fees, we vacate its award of attorney's fees to the respondent. We further hold that the *Gosselin* procedure applies to any attorney's fees the respondent incurs in the future. On remand, the trial court shall determine the reasonableness of the attorney's fees claimed by the respondent, which means that she shall submit a statement of fees claimed and any supporting documentation. *See Gosselin*, 136 N.H. at 353-54. After the petitioner has been given an opportunity to respond, the trial court shall determine the amount of fees to be awarded.

The petitioner next asserts that the award of future attorney's fees to the respondent violates his state constitutional rights to due process, equal protection and equal access to the courts. We decline to address these constitutional arguments because the petitioner has not demonstrated that he preserved them for our review. *See Bean*, 151 N.H. at 250. The petitioner's motion for reconsideration challenging the fee award did not mention equal protection or equal access to the courts. *See id.* Although, in a footnote to that motion, the petitioner asserted that the award of future fees denied him "due process," this reference was insufficient to preserve a claim under the State Constitution. *See Dellorfano*, 128 N.H. at 632-33.

Finally, the petitioner challenges the court's order requiring that he pay the fees of the GAL and the future fees of the court-ordered mediator. We

decline to review these arguments because they are not sufficiently developed. *See ACG Credit Co. v. Gill*, 152 N.H. 260, 264 (2005).

*Affirmed in part; vacated in part; and remanded.*

BRODERICK, C.J., and DUGGAN and GALWAY, JJ., concurred.