Hillsborough-southern judicial district
No. 2009-309

IN THE MATTER OF
THEODORE J. GOODLANDER AND ELIZABETH M. TAMPOSI

Argued: September 8, 2010
Opinion Issued: February 25, 2011

*Douglas, Leonard & Garvey, P.C.*, of Concord (*Charles G. Douglas, III* on the brief and orally), for the petitioner.

*Brennan, Caron, Lenehan & Iacopino*, of Manchester (*William E. Brennan* and *Jaye L. Rancourt* on the brief, and *Mr. Brennan* orally), for the respondent.

CONBOY, J. The petitioner, Theodore J. Goodlander, appeals the final divorce decree issued by the Superior Court (*Nicolosi*, J.), which awarded him alimony from the respondent, Elizabeth M. Tamposi, and a percentage of the marital property. He argues that the trial court erred by: (1) finding that post-divorce trust income that Tamposi may receive as a beneficiary of certain family trusts is not marital property; (2) retroactively applying the Uniform Trust Code (UTC), *see* RSA ch. 564-B (2007 & Supp. 2010); (3) using the wrong legal standard to calculate alimony; (4) awarding a near equal division of the parties' non-trust assets; (5) awarding Tamposi 1.6 million dollars from the sale of a family trust's interest in the Boston Red Sox; and (6) allowing his adult children to intervene in the divorce action. We affirm in part, vacate in part, and remand.

## I. Facts

The following facts are drawn from the record. The parties married on January 25, 1982. Together they have three adult children. Prior to the marriage, Tamposi worked for the Tamposi family business with her father, Samuel Tamposi, Sr., and her five siblings. Goodlander worked in the computer industry and was the owner of Cab Tech, Inc. (Cab Tech). During

the course of the marriage, Goodlander formed two additional companies, Storage Computer Corporation (SCC), a publicly traded computer marketing and manufacturing company, and Kristiania Corp. (Kristiania), a real estate holding company. Ownership of the assets of Cab Tech, including all patents, was later transferred to SCC. Goodlander gave each of the parties' children a ten percent share in SCC, while he maintained a twenty-five to thirty percent ownership interest. Meanwhile, Tamposi left her position in the Tamposi family business in 1989 to serve as the Assistant Secretary of State for Consular Affairs in Washington D.C. In 1992, she ended her service in Washington D.C. and, other than some consulting work, has not since been employed outside the home.

That same year, Samuel Tamposi, Sr., established two trusts as part of a comprehensive estate plan: the Samuel A. Tamposi, Sr. 1992 Trust, with amendments (SAT Trust); and the Samuel A. Tamposi, Sr. 1994 Irrevocable Trust. The trusts' assets are worth approximately 72 million dollars and consist primarily of real estate or entities that own and manage real estate. At issue in this case is the SAT Trust. Sub-trusts were created for the benefit of each sibling and his or her issue, to be funded by distributions from, and governed by the terms of, the SAT Trust. A spendthrift provision of the SAT Trust states that "[t]he interest of each beneficiary, and all payments of income or principal to be made to or for any beneficiary, shall be free from interference or control by any creditor or spouse (or divorced former spouse) of the beneficiary." Upon Samuel Tamposi, Sr.'s death in 1995, Tamposi and the parties' children became the beneficiaries of the Elizabeth Tamposi sub-trusts (collectively, the EMT Trust).

Under the terms of the SAT Trust, each sub-trust, including the EMT Trust, has a trustee with the discretion to pay "such amounts from the net income and principal of the [sub-]trust and in such proportions among them as the trustee considers necessary for [a beneficiary's] education and maintenance in health and reasonable comfort." Tamposi and her children have been receiving distributions from the EMT Trust since 1995.

In addition, Tamposi acquired certain minority interests in other real estate entities during the course of the marriage, hereinafter referred to as the "non-trust assets." The non-trust assets are valued at approximately $4,818,310. Income from the non-trust assets has been paid to Tamposi according to her ownership interest in these entities.

Goodlander enjoyed success in his business endeavors during the first twenty years of the parties' marriage. However, beginning in 2003, the computer industry experienced a market decline and Goodlander's business endeavors began to fail. Goodlander made efforts to revive his

businesses, including forfeiting his own salary. He has earned no income since 2003. By 2005, SCC stock had no value and was no longer publicly traded.

In an attempt to maintain the financial solvency of SCC, Goodlander secretly withdrew, over a period of years, approximately $898,480 from his children's custodial accounts, for which he served as fiduciary and sole custodian. He also secretly withdrew $80,000 from Tamposi's personal bank account with the use of a power of attorney granted to him for an unrelated purpose. This money was lent to Kristiania, which lent it to SCC, in a failed attempt to salvage the company.

In 2006, the parties separated and on May 16, 2007, Goodlander filed for divorce, citing irreconcilable differences. Although the parties' children originally intervened in this case in an attempt to protect their financial interests, they withdrew their petition on the first day of trial. On January 21, 2009, following a six-day hearing, a divorce was granted on the basis of irreconcilable differences.

In its final decree, the trial court awarded Tamposi the parties' Gilford home, as well as 49% of the non-trust assets. Goodlander was awarded 51% of the non-trust assets. With respect to the EMT Trust, the trial court concluded that "future distributions or the anticipated stream of income [from the EMT Trust] are not a property interest subject to division, because under the terms of this trust, any distribution is 'a mere expectancy.' " As a result, the trial court found that "Mr. Goodlander has no right to the corpus of the trusts, the remainder, or beneficial interest. Other than the alimony that is awarded, he has no right to any distribution from the SAT Trusts or the EMT Trust."

As to alimony, the trial court concluded that under the provisions of the UTC, Tamposi could not force a distribution from the EMT Trust to accommodate an award of alimony unless it was to provide for "the most basic food, shelter and medical needs" of her former spouse. Goodlander was therefore awarded $50,000 per year in alimony to meet his "most basic needs," to be paid by the trustee of the EMT Trust to him directly. Goodlander appeals the final divorce decree on several grounds. We address each of his arguments in turn.

## II. Trust Distributions as Marital Property

Goodlander first argues that the trial court erred in finding that any post-divorce distributions from the EMT Trust are not marital property subject to division. Specifically, he argues that Tamposi has a vested right in the SAT Trust and, therefore, he is entitled to a portion of the future distributions she receives through the EMT Trust. Therefore, he argues,

the trial court erred in concluding that Tamposi's right to future distributions from the EMT Trust rises only to the level of a "mere expectancy." We disagree.

"[T]he trial court first determines, as a matter of law, what assets are marital property under RSA 458:16-a, I, and thus subject to equitable distribution, and then exercises its discretion to make an equitable distribution of those assets." *In the Matter of Chamberlin & Chamberlin*, 155 N.H. 13, 16 (2007). "Trial court determinations under RSA 458:16-a, I, are reviewed *de novo*, while equitable divisions of property pursuant to RSA 458:16-a, II are reviewed for an unsustainable exercise of discretion." *Id.* Because Goodlander challenges the ruling that future distributions of the EMT Trust are not marital property, our review is *de novo*.

"[Marital] [p]roperty shall include all tangible and intangible property and assets, real or personal, belonging to either or both parties, whether title to the property is held in the name of either or both parties." RSA 458:16-a, I (2004). Here, the parties do not dispute that the corpus of the SAT Trust is not marital property subject to division under the statute, as Tamposi has no right to invade the trust corpus. *See Chamberlin*, 155 N.H. at 17 ("If neither the settlor nor the settlor's creditors may invade the corpus of an irrevocable trust, it would be incongruous to count such a trust as a marital asset, interchangeable with other assets upon which the parties freely may draw."); *see also* RSA 564-B:5-505(a)(2). Nevertheless, Goodlander argues that because an independent trustee is authorized to make distributions from the EMT Trust to Tamposi for her "education, maintenance in health and reasonable comfort," she has a vested right to future distributions from the EMT Trust. In support of his argument, Goodlander cites *Chamberlin*, in which we concluded that "the marital interest subject to division is not the [trust corpus] itself but the parties' interest in the trust." *Chamberlin*, 155 N.H. at 18 (quotation and brackets omitted). While we agree that the parties' interest in the trust is paramount in determining whether the trust assets are marital property, we do not agree that Tamposi's interest in any future distributions of the EMT Trust constitutes more than a mere expectancy.

■ "A perfect vested right can be no other than such as is not doubtful, or depending on any contingency, but absolute, fixed and certain." *In the Matter of Goldman & Elliott*, 151 N.H. 770, 774 (2005) (quotation omitted).

> [I]f a distribution to or for the benefit of a beneficiary is subject to the exercise of the trustee's discretion, whether or not the terms of a trust include a standard to guide the trustee in making distribution decisions, then the beneficiary's interest is neither a property interest nor an enforceable right, but a mere expectancy.

RSA 564-B:8-814(b).

Here, Tamposi's hope for a discretionary distribution from the EMT Trust is not a fixed, certain and absolute right. The terms of the SAT Trust state that all assets of the SAT Trust are to be controlled and managed by investment directors Samuel A. Tamposi, Jr. and Stephen A. Tamposi, Tamposi's brothers. The directors are given the powers of "management, control, handling, financing, refinancing and structuring of any and all real estate interests," as well as "full power and authority to direct the retention or sale of all other assets . . . included in the trust property." Each sub-trust, including the EMT Trust, is funded by distributions made from the SAT Trust by the investment directors.

Testimony at the parties' divorce hearing indicated that certain funds generated from the SAT Trust assets are generally not reinvested; rather, the practice of the investment directors has been to distribute such funds to the sub-trusts once the balance of the "common account" of the SAT Trust reaches approximately $50,000. Once funds have been distributed to the sub-trusts by the investment directors, the trustee of each sub-trust has the discretion to distribute those funds to the trust beneficiaries for their "education and maintenance in health and reasonable comfort," bearing in mind that he or she has a fiduciary duty to all beneficiaries of the trust and must pay out taxes and other expenses necessary to meet the trust's financial obligations. A beneficiary is thus twice removed from access to the trust assets — first, by the investment directors' discretion in making distributions to the sub-trusts, and again by the trustee's discretion to distribute any sub-trust funds to the beneficiaries.

Samuel Tamposi, Jr. testified that beneficiaries have no authority to force distributions by a trustee, and that any distributions are solely within the trustee's total authority and jurisdiction. Similarly, Attorney Joseph McDonald, an expert on trusts and estates law, testified that the significance of the third party trustee to the EMT Trust was that Tamposi "as a practical matter, [has] no control to compel distributions."

We further note that, in reviewing the language of the SAT Trust and its sub-trusts in connection with a separate action initiated by Tamposi in probate court, the probate court aptly noted:

> That the trust instrument grants the trustee authority to distribute principal and income is not a compelling argument for enabling the trustee to issue mandates to or superintend the investment directors. The investment directors make distributions to the trustees that include income from investment assets as well as proceeds from their sale. When cash is distributed to the subtrusts, *it may be retained or distributed to the beneficiaries, in the discretion of the trustee.*

(Emphasis added.)

Nevertheless, Goodlander makes much of the following testimony of EMT trustee Julie Shelton:

> A. . . . The trustee may, from time to time, pay to or for the benefit of [Tamposi], and [Tamposi's] issue, from time to time, living, or any one or more of them, such amounts from the net income and principal of the trust, and in such proportion among them, as the trustee considers necessary for their education and maintenance and health and reasonable comfort, taking into consideration the income and cash resources known to the trustee to be available for such purposes from the other source.

> . . . .

> Q. So is it your testimony you have unfettered discretion to do whatever you want?

> A. No, of course not.

This exchange does not support the proposition that Tamposi has control over trust distributions. Shelton owes a fiduciary duty to all beneficiaries of the trust. *See* RSA 564-B:8-802 ("A trustee shall administer, invest and manage the trust and distribute the trust property solely in the interests of the beneficiaries."); RSA 564-B:8-803 ("If a trust has 2 or more beneficiaries, the trustee shall act impartially in administering, investing, managing, and distributing the trust property, giving due regard to the beneficiaries' respective interests."); RSA 564-B:8-804 ("A trustee shall administer, invest, and manage the trust and distribute the trust property as a prudent person would . . . ."); RSA 564-B:8-810(a) ("A trustee shall keep adequate records of the administration of the trust."); RSA 564-B:8-811 ("A trustee shall take reasonable steps to enforce claims of the trust and to defend claims against the trust."). Thus, while the trustee does not have unfettered discretion to do whatever she wants with funds from the trust, she nonetheless possesses discretion to distribute to the beneficiaries, or retain in the sub-trusts, funds disbursed by the investment directors.

Because the trustee of the EMT Trust has the sole discretion to distribute funds to the beneficiaries, including Tamposi, any interest Tamposi has in future distributions fits squarely within the definition provided by the UTC for a "mere expectancy." RSA 564-B:8-814(b). That is, any distribution to or for the benefit of Tamposi "is subject to the exercise of the trustee's discretion, whether or not the terms of a trust include a standard to guide the trustee in making distribution decisions." *Id.*

Accordingly, Tamposi's interest in future distributions of the EMT Trust "is neither a property interest nor an enforceable right, but a mere expectancy." *Id.*

Goodlander argues that under *Tuttle v. New Hampshire Medical Malpractice Joint Underwriting Assoc.*, 159 N.H. 627 (2010), Tamposi's beneficial interest in the SAT Trust is equivalent to a vested right. We find *Tuttle* distinguishable. In *Tuttle*, policyholders of the Joint Underwriting Association (JUA) alleged that pursuant to their contracts with the JUA and certain administrative rules, they had a vested right in any excess surplus premiums collected by the JUA. *Tuttle*, 159 N.H. at 634. In concluding that the petitioners did have such a vested right, we emphasized that "the JUA regulations, *rather than conferring discretion*, mandate one or both of two options for application of any excess surplus, both of which inure to the policyholders' direct financial benefit." *Id.* at 646 (emphasis added). Thus, it was only under those limited circumstances that we concluded a beneficial interest *may* constitute a vested property right, subject to protection. *Id.* at 644-45.

Here, it is precisely because there is no mandated financial benefit to Tamposi from the EMT Trust that her interest is not vested. Because the trustee of the EMT Trust has the discretion to retain funds within the sub-trust or to distribute funds for the benefit of the other beneficiaries, none of the beneficiaries possess a vested interest in future trust distributions. Tamposi is not empowered to direct disbursement of EMT Trust funds for her benefit.

Goodlander asserts in passing that Tamposi has the right to appoint herself as trustee and to directly access the EMT Trust assets. The record, however, does not support this assertion. The trust instrument does not indicate Tamposi may appoint herself as trustee. Further, while it is undisputed that she won the right, via litigation against the investment directors, to appoint a trustee of her choice for the EMT Trust, the undisputed testimony of expert witness Attorney McDonald was as follows:

> And then we had this dust up in the probate court followed by a settlement in 2006 which effectively revoked certain provisions of the trust, and that gave [Tamposi] the ability to appoint her own trustee and that's where Julie [Shelton] came into the picture, and also gave her a very common power in trust documents to remove and replace that trustee as well.
>
> But that trustee is restricted. [Tamposi's] power is restricted to a successor trustee that is not [Tamposi] herself, [or] any of [Tamposi's descendants]. It's got to be a so-called disinterested

trustee, no beneficial interest in the trust estate, and it can't be anyone related or subordinate to [Tamposi] or any other beneficiary.

Thus, Tamposi may not simply appoint herself as trustee in order to access the EMT Trust funds.

### III. Retroactive Application of the UTC Language

Goodlander argues alternatively that the language of the UTC, which defines a distribution subject to a trustee's discretion as a mere expectancy, should not be applied retroactively in this case because its application is highly injurious to him. *See* RSA 564-B:8-814(b). We do not find this argument persuasive.

Here, the UTC specifically states that "this chapter applies to all trusts created before, on, or after its effective date," and that "this chapter applies to all judicial proceedings concerning trusts commenced on or after its effective date." RSA 564-B:11-1104(a)(1)-(2). The provision containing the "mere expectancy" language at issue, RSA 564-B:8-814(b), became effective September 9, 2008. Thus, the question here is whether the application of the UTC provisions to the SAT and EMT trusts, which were created before September 9, 2008, is prohibited.

Part I, Article 23 of the New Hampshire Constitution states that "[r]etrospective laws are highly injurious, oppressive, and unjust. No such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offenses." In *Tuttle*, we noted that "every statute which takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective." *Tuttle*, 159 N.H. at 641 (quotation omitted). As we have previously stated:

> Unless otherwise inhibited by either the State or Federal Constitutions, the Legislature may change existing laws, both statutory or common, at its pleasure, but in so doing, it may not deprive a person of a property right theretofore acquired under existing law. Those rights are designated as vested rights, and to be vested, a right must be more than a mere expectation based on an anticipation of the continuance of existing law; it must have become a title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from the demand of another. If, before a right becomes vested in a person, the law

upon which it is based is repealed, that particular person no longer has a remedy to enforce his claim, and if final relief has not been granted to him on the enforcement of a demand before such repeal, then no relief can be granted on his demand after the effective date of the repeal.

*Goldman*, 151 N.H. at 774 (quotation omitted). Therefore, retroactive application of a new law is prohibited only if it affects an individual's substantive, vested rights. *Id.* at 772.

In order to discern whether Goodlander had a vested right prior to the 2008 enactment of RSA 564-B:8-814, we must look to the language of the prior statute. "We are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole." *Kenison v. Dubois*, 152 N.H. 448, 451 (2005). "When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used." *Bennett v. Town of Hampstead*, 157 N.H. 477, 483 (2008). "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." *Farmington Teachers*, 158 N.H. 453 at 456 (quotation omitted).

 Here, an analysis of the previous version of RSA 564-B:8-814 does not lead us to conclude that Tamposi's beneficial interest in the EMT Trust is equivalent to a vested right. *See* RSA 564-B:8-814 (2007). Prior to the adoption of the "mere expectancy" language in 2008, the relevant portion of RSA 564-B:8-814 read as follows:

> (a) Notwithstanding the breadth of discretion granted to a trustee in the terms of the trust, including the use of such terms as "absolute," "sole," or "uncontrolled," the trustee shall exercise a discretionary power in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries.

> (b) [U]nless the terms of the trust expressly indicate that a rule in this subsection does not apply:

>> (1) A person other than a settlor who is a beneficiary and trustee of a trust that confers on the trustee a power to make discretionary distributions to or for the trustee's personal benefit may exercise the power only in accordance with an ascertainable standard; and

(2) a trustee may not exercise a power to make discretionary distributions to satisfy a legal obligation of support that the trustee personally owes another person.

This language gives no indication that a beneficial interest in a trust is equivalent to a vested interest. Indeed, it merely indicates that commonly used terms for the discretionary power of a trustee, such as "absolute," "sole," and "uncontrolled," nonetheless require a trustee to act in accordance with the terms of the trust and in the interests of the beneficiaries. Here, the terms of the trust provide that a trustee, who is not also a beneficiary, has the discretion to distribute sub-trust funds to the beneficiaries for their "education and maintenance in health and reasonable comfort," bearing in mind that the trustee has a fiduciary duty to all beneficiaries of the trust. However, as noted above, Tamposi is not empowered to direct the funds from the EMT Trust for her benefit because, under the terms of the SAT Trust, the EMT trustee is permitted the discretion to retain funds within the sub-trust or to distribute funds for the benefit of any one beneficiary, taking into account what is in the best interests of all the beneficiaries. Thus, Tamposi's interest in future trust distributions was not vested prior to the 2008 enactment of RSA 564-B:8-814(b) because the previous statute did not grant her legal title to future distributions, or the right to force distributions for her own benefit. *See Goldman*, 151 N.H. at 774.

As we have determined that Tamposi, as a beneficiary, has no vested right to the future distribution of funds from the EMT Trust, Goodlander, whose status is that of a non-beneficiary spouse, does not possess a vested, substantive right to any future distributions of the EMT Trust. Accordingly, the trial court did not err in retroactively applying the provisions of the UTC. *See* RSA 564-B:8-814(b).

## IV. Alimony Standard

Goodlander next argues that the trial court erred in determining alimony based upon the UTC in contravention of the alimony provisions of RSA 458:19 (Supp. 2010). *See* RSA 564-B:5-503(b)(2). We hold that the trial court erred in its application of the controlling law.

RSA 458:19 sets forth the standards for an award of alimony. It provides:

Upon motion of either party for alimony payments, the court shall make orders for the payment of alimony to the party in need of alimony . . . [if] the court finds that:

(a) The party in need lacks sufficient income, property, or both, including property apportioned in accordance

with RSA 458:16-a [regarding property division], to provide for such party's reasonable needs, taking into account the style of living to which the parties have become accustomed during the marriage; and

(b) The party from whom alimony is sought is able to meet reasonable needs while meeting those of the party seeking alimony, taking into account the style of living to which the parties have become accustomed during the marriage; and

(c) The party in need is unable to be self-supporting through appropriate employment at a standard of living that meets reasonable needs . . . .

RSA 458:19, I (Supp. 2010). RSA 458:19, IV(b) further provides:

In determining the amount of alimony, the court shall consider the length of the marriage; the age, health, social or economic status, occupation, amount and sources of income, the property awarded under RSA 458:16-a, vocational skills, employability, estate, liabilities, and needs of each of the parties; the opportunity of each for future acquisition of capital assets and income; the fault of either party as defined in RSA 458:16-a, II($l$); and the federal tax consequences of the order.

The UTC's provisions are applicable only to a limited, specified extent. In general:

A beneficiary may not transfer an interest in a trust in violation of a valid spendthrift provision and, except as otherwise provided [herein], a creditor or assignee of the beneficiary may not reach the interest or a distribution by the trustee before its receipt by the beneficiary.

RSA 564-B:5-502(c). However, the UTC sets forth a limited exception to this general rule. A spendthrift provision is unenforceable against:

a beneficiary's spouse or former spouse who has a judgment or court order against the beneficiary for alimony but only for and to the extent that such judgment or court order expressly specifies the alimony amount attributable to the most basic food, shelter and medical needs of the spouse or former spouse . . . .

RSA 564-B:5-503(b)(2). The UTC further states:

To the extent a trustee has not complied with a standard of distribution or has abused a discretion . . . the court shall direct the trustee to pay to the . . . former spouse such amount as is equitable under the circumstances but not more than the amount the trustee would have been required to distribute to or for the benefit of the beneficiary had the trustee complied with the standard or not abused the discretion and with respect to alimony, only for and to the extent that the judgment or court order expressly specifies the alimony amount attributable to the most basic food, shelter, and medical needs of the spouse or former spouse.

RSA 564-B:5-504(c)(2).

Goodlander argues that for the trial court to have applied the UTC "most basic needs" provision, it must have concluded that it repealed, either expressly or by implication, the provisions of RSA 458:19. We disagree with this assertion and conclude that a plain reading of the statutes evinces that RSA 458:19 is the standard for determining alimony, while the UTC restricts the amount of alimony that may be paid from funds of an irrevocable trust containing a spendthrift provision. *See* RSA 564-B:5-503(b)(2). The statutory provisions are therefore not conflicting; but for the UTC's limited exception that allows access to a trust's funds to meet a former spouse's basic needs, a trust beneficiary's interest would not be reachable by that former spouse prior to receipt by the beneficiary. Thus, the UTC protects, but only to a limited extent, a trust beneficiary's former spouse who has been awarded alimony under the standard set forth in RSA 458:19.

Here, it is undisputed that Goodlander has generated no steady income since 2003 and that Tamposi has not been steadily employed since 1992. Moreover, as between the parties, Goodlander was awarded fifty-one percent of the income-generating non-trust assets, to offset the award of the marital home to Tamposi. Notwithstanding the property division, however, the trial court found Goodlander was "entitled to alimony based on the current income available to him for support." In so finding, the trial court found that an award of alimony was appropriate because "Mr. Goodlander has no funds with which to support himself in even a modest lifestyle, which is not what the parties enjoyed during the marriage," while Tamposi "has benefited from some distributions from the EMT Trusts."

Nevertheless, the trial court awarded Goodlander alimony contingent upon Tamposi receiving distributions from the EMT Trust, and then only to meet his "most basic needs." Specifically, the trial court determined, "Mr. Goodlander is awarded $50,000 per year in alimony to meet his 'most basic

needs' . . . . Ms. Tamposi shall pay him fifty percent of any distribution she receives from the EMT Trusts up to $50,000 per calendar year, which the EMT Trust trustee shall pay to him directly."

■ While the trial court expressly specified the amount of alimony it found attributable to Goodlander's most basic needs, it erred in failing to first conduct the requisite analysis of Goodlander's "reasonable needs" under RSA 458:19, as well as Tamposi's ability to meet those needs. Rather than making findings as to Goodlander's reasonable needs, the trial court made findings only as to his "most basic needs," and then made payment of that amount contingent on Tamposi's receipt of trust distributions. This was error. Under the provisions of the UTC, a former spouse is entitled to seek a trust distribution to meet his or her most basic needs regardless of whether a trustee makes a distribution to the beneficiary. *See* RSA 564-B:5-503(b)(2); RSA 564-B:5-504(c)(2). Accordingly, we vacate the trial court's alimony order and remand to the trial court to determine an award of alimony consistent with this opinion.

## V. Division of Assets Outside the Trusts

Goodlander further argues that the trial court should have taken into account Tamposi's interest in the EMT Trust when dividing the non-trust assets and awarded him all of the parties' non-trust assets to offset the interest Tamposi has in the EMT Trust that cannot be assigned to him. In support of this argument, Goodlander cites *Lawlor & Lawlor*, 123 N.H. 163 (1983), and *In the Matter of Hampers & Hampers*, 154 N.H. 275 (2006), for the proposition that assets outside of the marital property that are held by one party are properly considered by the trial court in dividing the marital property. We find both *Lawlor* and *Hampers* distinguishable.

In *Lawlor*, the husband's vested, though undistributed, legacy under a deceased parent's will was properly considered by the trial court in dividing the parties' marital assets. *Lawlor*, 123 N.H. at 165-66. As noted above, Tamposi's interest in any future distributions from the EMT Trust is only a mere expectancy. Similarly, in *Hampers*, the husband had power over a revocable trust worth an estimated 15 million dollars, which he created during the course of the marriage. *Hampers*, 154 N.H. at 278. In dividing the parties' marital assets, the trial court properly took into account the husband's interest in the trust, which was plainly more than a mere expectancy. *Id.* at 285-86.

"As we afford trial courts broad discretion in determining matters of property distribution in fashioning a final divorce decree, we will not overturn the trial court's decision absent an unsustainable exercise of

discretion." *Id.* at 285. "If the court's findings can reasonably be made on the evidence presented, they will stand." *Id.* (quotation omitted).

■ Here, the trial court properly refused to take into account potential future distributions from the EMT Trust, and concluded that "but for the remaining debts related to the funds taken from the children's custodial accounts . . . [,] an essentially equal division [of the marital property] is fair." *See* RSA 564-B:8-814(b). Given all the circumstances, we do not conclude that the trial court erred in declining to award Goodlander the entirety of the parties' assets.

We note that Goodlander challenges the trial court's finding that the non-trust assets were acquired by Tamposi "primarily by gift or inheritance from her father." He notes that several witnesses testified that a number of Tamposi's non-trust assets were neither given to her nor inherited. Thus, Goodlander asserts the trial judge erred in dividing the non-trust assets "in only a 51/49% formula because [the trial court] thought the bulk of them came by gift from Ms. Tamposi's father." We find no error.

Whether the assets owned by Tamposi were gifts, inherited or earned, the trial court specifically stated that "considered in context of all the evidence, the Court does not conclude the source of [the non-trust] assets warrants an uneven split." On the record before us, we do not find that the trial court unsustainably exercised its discretion in dividing the marital assets.

## VI. Red Sox Sale Proceeds

Goodlander further argues that the trial court erred in failing to properly take into account Tamposi's share of the proceeds from the SAT Trust's sale of its interest in the Boston Red Sox. We disagree.

In January 2008 the investment directors of the SAT Trust sold certain shares held by the trust in the Boston Red Sox. The EMT Trust's portion of the proceeds amounted to approximately 1.6 million dollars, the distribution of which the trial court enjoined until issuance of the final decree. The undisputed testimony at trial was that these proceeds are an asset of the EMT Trust. Trustee Julie Shelton initiated litigation on behalf of the trust to force the sale of the Boston Red Sox shares, and at least twenty-five percent of the proceeds allocated to the EMT Trust were earmarked for attorney's fees.

■ As discussed above, the beneficiaries' interests in future distributions from the EMT Trust constitutes a mere expectancy. *See* RSA 564-B:8-814(b). Because Tamposi has no right to force distributions from the EMT Trust, the trial court did not err in declining to impute assets of

the EMT Trust to Tamposi. Accordingly, the trial court properly excluded the Red Sox sale proceeds in its distribution of the marital assets.

*VII. Children As Intervenors*

Finally, Goodlander argues that the trial court erred by allowing the children to intervene in the parties' divorce. We find no error.

■ ■ "A person who seeks to intervene in a case must have a right involved in the trial and his interest must be direct and apparent; such as would suffer if not indeed be sacrificed were the court to deny the privilege." *In the Matter of Stapleford & Stapleford*, 156 N.H. 260, 263 (2007) (quotation omitted). Here, the parties' children originally intervened for the purpose of protecting their interests in the EMT Trust in light of Goodlander's assertions that he is entitled to an award of some portion of trust funds distributed to Tamposi. As the children are also beneficiaries of the EMT Trust, any such award to Goodlander would directly affect their financial interests. Additionally, the children intervened to ensure that the court would take into account the significant debt owed to them by Goodlander.

Although the children were permitted to withdraw from the proceeding on the first day of trial, Goodlander argues that they should have been prevented from intervening in the first instance based upon our holding in *Stapleford*. In *Stapleford*, the divorcing parties' minor children attempted to intervene in order to participate in the parenting plan. *Id.* at 262. We concluded that the minor children were not entitled to intervene because minors do not enjoy the same legal rights as do adults. *Id.* at 263. Here, however, two of the children were adults when the divorce action was initiated and the third reached the age of majority during the pendency of the proceedings. Moreover, the Goodlander children intervened for the purpose of protecting their direct financial interests, and not to interject their opinions as to any parenting issues.

We are also unconvinced that Goodlander was financially harmed by the children's limited intervention in the case. The record reflects that the children's discovery requests were minimal and directly related to the issues in dispute. Under all the circumstances, we conclude the trial court did not unsustainably exercise its discretion in allowing the children's intervention.

■ Finally, to the extent Goodlander argues that the children should have been prevented from intervening because they had an alternative, adequate remedy at law, this argument was not properly preserved and we therefore decline to address it. *See LaMontagne Builders v. Brooks*, 154

N.H. 252, 258 (2006) ("This court has consistently held that we will not consider issues raised on appeal that were not presented in the lower court." (quotation omitted)).

*Affirmed in part; vacated in part; and remanded.*

DUGGAN, J., concurred; HORTON, J., retired, specially assigned under RSA 490:3, concurred.