NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

2nd Circuit Court-Haverhill Probate Division
No. 2022-0145

IN RE ROBERT T. KEELER MAINTENANCE FUND FOR THE HANOVER COUNTRY CLUB AT DARTMOUTH COLLEGE

Argued: March 30, 2023
Opinion Issued: July 13, 2023

McLane Middleton, Professional Association, of Manchester (Ralph F. Holmes on the brief and orally), for the petitioner.

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Diane Murphy Quinlan, director of charitable trusts, and Michael R. Haley, assistant director of charitable trusts, on the memorandum of law, and Michael R. Haley orally), for the respondent.

Laboe & Tasker, PLLC, of Concord (Danielle C. Gaudreau and John E. Laboe on the brief, and John E. Laboe orally), for the putative intervenors.

HICKS, J. The putative intervenors, the Robert T. Keeler Foundation (the Foundation) and Peter P. Mithoefer, the fiduciary for the Estate of Robert T. Keeler (the Estate), appeal orders of the Circuit Court (Rappa, J.), which: (1)

denied their motion to intervene in proceedings brought under the Uniform Prudent Management of Institutional Funds Act (UPMIFA), see RSA ch. 292-B (2016 & Supp. 2022), by the petitioner, the Trustees of Dartmouth College (Dartmouth), and assented to by the respondent, the New Hampshire Director of Charitable Trusts (DCT), to modify the restrictions governing an institutional fund created by a charitable gift pursuant to the last will and testament of Robert T. Keeler (the decedent), see RSA 292-B:6 (Supp. 2022); and (2) granted Dartmouth's assented-to application to modify. On appeal, the putative intervenors argue that they had "special interest" standing pursuant to In re Trust of Eddy, 172 N.H. 266, 274-75 (2019), and that granting the assented-to application was error. We affirm the denial of the putative intervenors' motion to intervene for lack of standing and, therefore, necessarily also affirm the decision to grant the assented-to application.

The following facts either are alleged by the putative intervenors or reflect the content of documents in the record submitted on appeal. The decedent signed his last will and testament in May 1999. The will included a specific bequest to Dartmouth of a portion of his residuary estate as follows:

> Fifty percent (50%) to DARTMOUTH COLLEGE, Hanover, New Hampshire, for the sole purpose of upgrading and maintaining its golf course. Nevertheless, if in the Executor's sole and absolute discretion, the golf course has been sufficiently upgraded and is being adequately maintained, then any amounts in excess of the amounts the Executor determines to be necessary to sufficiently upgrade and adequately maintain the golf course shall be distributed to the ROBERT T. KEELER FOUNDATION, an Ohio nonprofit organization, located in Cincinnati, Ohio.

The decedent died in 2002. As the trial court found, and the putative intervenors concede, "the gift instrument [did] not expressly provide a reverter back to the [decedent's] estate or successors."

In 2005, the decedent's widow, who was the executor of his estate, and Dartmouth entered into a "Statement of Understanding," which provided, in pertinent part:

> The Robert T. Keeler 1936 Maintenance Fund for the Hanover Country Club at Dartmouth College is a quasi endowment established by the College with a bequest of $1.8 million from [the] Estate of Robert T. Keeler (henceforth referred to as "the Donor"). This gift is made, consistent with Mr. Keeler's wishes to support the golf course, so that future generations of Dartmouth students and members of the Dartmouth community may continue to enjoy the great game of golf at the course which he so loved.
> . . . .

2

It was determined that a bequest of $1.8 million would sufficiently cover the cost of upgrading and maintaining the golf course, and the College agreed to designate the bequest to quasi endowment. Income (and/or principal if needed) is restricted to support upgrades and maintenance of the golf course, including golf course facilities.

Thereafter, as the trial court found and the putative intervenors concede, the decedent's charitable gift was completed.

In July 2020, Dartmouth decided to permanently close the Hanover Country Club golf course. In August 2021, with the assent of the DCT, see RSA 7:20 (2020), Dartmouth applied to the trial court under the UPMIFA to modify "certain restrictions on the permissible use of the Robert T. Keeler Maintenance Fund for the Hanover Country Club at Dartmouth College (hereinafter the 'Keeler Fund')." See RSA 292-B:6, III. Specifically, Dartmouth asked the court to

modify the restriction that the Keeler Fund be used to upgrade and maintain the golf course at the Club, which is now permanently closed, to provide that the Keeler Fund be used as follows (in order of preference):

a. To support the study and design of golf practice area(s) and practice holes, as well as the construction, upkeep, improvement and maintenance of these facilities, that would support Dartmouth's men's and women's varsity golf programs and other physical education and recreation programs run by Dartmouth that relate to golf, and/or for educational and recreational access to golf by our students, faculty and staff, including without limitation support for the agronomic and infrastructure needs of these facilities, inclusive of supplies, equipment purchases and other necessary investments;

b. To support the administrative activities and equipment storage needs for Dartmouth's varsity golf programs and/or other physical education and recreational golf programs run by Dartmouth, including without limitation the upkeep, improvement and potential renovation of the existing clubhouse for these purposes; and

c. To otherwise support Dartmouth's varsity golf programs, and/or other physical education and recreational golf programs run by Dartmouth.

Thereafter, the Estate was reopened and Mithoefer was appointed as its fiduciary. In October 2021, the putative intervenors moved to intervene in Dartmouth's application under the UPMIFA to modify the restrictions on the Keeler Fund, alleging that by permanently closing the Hanover Country Club golf course, Dartmouth frustrated the purposes of the 2005 Statement of Understanding and rendered any remaining money in the Keeler Fund "in excess" of amounts the executor deemed necessary to upgrade and maintain the golf course. (Quotation omitted.) The putative intervenors asserted that, therefore, "[a]ll funds remaining in the Keeler . . . Fund should be directed to the Foundation at the behest of the Estate."

Following a hearing, the trial court denied the motion to intervene, but afforded the putative intervenors leave to file a brief as amici curiae with respect to the proposed modification of the Keeler Fund. The putative intervenors did not file such a brief. Instead, they unsuccessfully moved for reconsideration. Thereafter, the trial court granted Dartmouth's application to modify the charitable purpose of the Keeler Fund as requested.

Our standard for reviewing probate division decisions is set forth by statute. See RSA 567-A:4 (2019). "The findings of fact of the judge of probate are final unless they are so plainly erroneous that such findings could not be reasonably made." Id. Consequently, we will not disturb the probate division's decree unless it is unsupported by the evidence or plainly erroneous as a matter of law. See In re Estate of Donovan, 162 N.H. 1, 3-4 (2011).

The putative intervenors argue that the trial court erred as a matter of law by denying their motion to intervene. "A person who seeks to intervene in a case must have a right involved in the trial and his interest must be direct and apparent; such as would suffer if not indeed be sacrificed were the court to deny the privilege." In the Matter of Goodlander & Tamposi, 161 N.H. 490, 506 (2011) (quotation omitted). It is within the trial court's discretion to grant intervenor status. Lamarche v. McCarthy, 158 N.H. 197, 200 (2008). Thus, we will not overturn the trial court's decision unless we are persuaded that the court's exercise of discretion is unsustainable. Id. The putative intervenors have the burden of demonstrating that they have standing to intervene. Cf. Conduent State & Local Solutions v. N.H. Dep't of Transp., 171 N.H. 414, 418 (2018) (concerning standing to sue). Because the material facts related to standing are undisputed, the issue of standing presents a question of law, which we review de novo. See In re Trust of Eddy, 172 N.H. at 273.

The statutory provision pursuant to which Dartmouth filed its petition is RSA 292-B:6, III, which provides:

> If a particular charitable purpose or a restriction contained in a gift instrument on the use of an institutional fund becomes unlawful, impracticable, impossible to achieve, or wasteful, the

4

court, upon application of an institution, may modify the purpose of the fund or the restriction on the use of the fund in a manner consistent with the charitable purposes expressed in the gift instrument. The institution shall notify the attorney general of the application, and the attorney general must be given an opportunity to be heard.

On appeal, the putative intervenors do not dispute that RSA 292-B:6, III applies to this proceeding. Nor do they argue that the plain language of RSA 292-B:6, III confers standing upon them. Rather, they contend that "RSA 292-B:6 is silent concerning the issue of standing" in a modification proceeding, "with the exception of the petitioning institution and the . . . attorney general." The putative intervenors claim to have "special interest standing" to intervene pursuant to the so-called "Blasko test." See In re Trust of Eddy, 172 N.H. at 273-75 (adopting the Blasko five-factor test); Mary Grace Blasko, Curt S. Crossley, and David Lloyd, Standing to Sue in the Charitable Sector, 28 U.S.F. L. Rev. 37, 61 (1993). They argue that special interest standing and the Blasko factors apply to this proceeding because RSA 292-B:6 "embraces existing charitable trust law."

We have recognized the special interest standing doctrine as an exception to the general common law rule "that potential trust beneficiaries, in suits involving charitable trusts, may not bring an action to enforce the terms of such a trust." In re Trust of Eddy, 172 N.H. at 273. "Instead, the attorney general (or the DCT as his representative) has the statutory power and duty to represent the public in the enforcement and supervision of charitable trusts." Id. We noted that, as others have explained, "the rationale for vesting exclusive power in a public officer stems from the inherent impossibility of establishing a distinct justiciable interest on the part of a member of a large and constantly shifting benefitted class," and the burdens on the trust res and trustee from "vexatious litigation that would result" from recognizing claims by any number of "individuals who might benefit incidentally from the trust." Id. at 273 (quotations omitted). In In re Trust of Eddy, we joined other jurisdictions and agreed with the Restatement (Third) of Trusts in recognizing an exception to this general rule "when a clearly identified class" of potential beneficiaries has a "special interest" in the enforcement of a charitable trust. Id. (quotation omitted); see Restatement (Third) of Trusts § 94 (2012).

We adopted the Blasko test for determining whether the potential beneficiary of the charitable trusts in that case had special interest standing to bring affirmative claims against the trustees of a trust. In re Trust of Eddy, 172 N.H. at 268-73, 275. The Blasko test "sets forth five factors to determine whether a plaintiff's interest is distinct enough from the public at large to justify conferring standing upon the plaintiff in order to enforce a charitable trust." Id. at 271. The five Blasko factors are: "(1) the extraordinary nature of the acts complained of and the remedies sought; (2) the presence of bad faith;

5

(3) the attorney general's availability and effectiveness; (4) the nature of the benefitted class and its relationship to the charity; and (5) the social desirability of conferring standing." Id. In In re Trust of Eddy, we concluded that "a balancing test of all five Blasko factors best comports with New Hampshire law." Id. at 275.

The putative intervenors ask us to extend our holding in In re Trust of Eddy to this case despite its factual differences. The instant matter involves a completed charitable gift, not an ongoing charitable trust as in In re Trust of Eddy. Id. at 268-69. Additionally, the instant matter concerns the UPMIFA, and In re Trust of Eddy did not. Id. at 269-71.

The putative intervenors have not cited any case in which a court has applied the Blasko test to determine whether a deceased donor's estate and a former contingent beneficiary had special interest standing to intervene in a proceeding brought under the UPMIFA, and we have been unable to find such a case. The putative intervenors have not persuaded us to extend our holding in In re Trust of Eddy, including our adoption of the Blasko factors, to this case. We, therefore, decline to do so.

We are also unpersuaded to the extent that the putative intervenors assert that denying their motion to intervene violated the State and Federal Constitutions because it deprived them of a "vested interest" in the funds. The putative intervenors contend that the Estate has a "vested interest in the resulting trust" that they argue will arise "[i]f the application of cy pres is not an available remedy because there is a lack of [the donor's] general [charitable] intent." They argue that the Foundation has a "vested interest" in the same alleged resulting trust because it "would be the ultimate beneficiary of the funds pursuant to [the decedent's] explicit instructions."

To support their arguments, the putative intervenors mistakenly rely upon Opinion of the Justices, 101 N.H. 531 (1957). In Opinion of the Justices, the individual justices described the authority of courts of equity to "permit departure from the literal terms of [a charitable] trust by exercise of the power of cy pres," as follows:

> The courts will exercise this power . . . only when the purpose for which the fund was established cannot be carried out, and diversion of the income to some other purpose can be found to fall within the general intent of the donor expressed in the instrument establishing the trust. If the trust instrument discloses no general charitable intent, as distinguished from the particular purpose for which the gift was made, the trust will fail, and its assets will be held by the trustee subject to a resulting trust in favor of the donor or his estate.

6

Opinion of the Justices, 101 N.H. at 533 (citations omitted).

Opinion of the Justices was issued in 1957, however, long before New Hampshire adopted the Uniform Trust Code in 2004, which modified the common law cy pres doctrine.  See RSA 564-B:4-413 (2019); Unif. Trust Code § 413, cmt. (2010), https://higherlogicdownload.s3-external-1.amazonaws.com/UNIFORMLAWS/5e192d5d-f0d2-2bc1-9d82-50ddf17447be_file.pdf?AWSAccessKeyId=AKIAVRDO7IEREB57R7MT&Expires=1687274336&Signature=Mm%2BG2BBCAY7JvyEN1%2FjuEPPlexg%3D (last visited June 20, 2023); Hodges v. Johnson, 170 N.H. 470, 480 (2017) ("When interpreting a uniform law, such as the Uniform Trust Code, the intention of the drafters of a uniform act becomes the legislative intent upon enactment." (quotation omitted)).  At common law, "courts were empowered to modify a charity's purposes or the purposes for which it held certain assets if: (1) a valid charitable trust, a charity that was a corporation, or a gift to be used for a valid charitable purpose existed; (2) it had become unlawful or impossible to carry out the donor's original intention; and (3) the donor had a general charitable intent as well as the intent to benefit the particular charitable object the donor had designated."  Restatement of the Law of Charitable Nonprofit Organizations § 3.02, cmt. c (2021).  If the court found that the settlor had a general charitable intent, "the court could apply cy pres and authorize the use of the trust property for other charitable purposes.  If such an intent was not found, the charitable trust failed."  Unif. Trust Code, supra § 413, cmt.

Over time, "courts in a number of states stopped requiring petitioners to demonstrate the existence of a general charitable intent and, absent contrary evidence, such as a gift over or a reversion, . . . presumed that charitable gifts evidenced a general charitable intent sufficient for the application of cy pres."  Restatement of the Law of Charitable Nonprofit Organizations, supra § 3.02, cmt. c.  The Uniform Trust Code adopts this position.  See Unif. Trust Code, supra art. 4, general cmt. (last visited June 20, 2023).

The Uniform Trust Code "modifies the doctrine of cy pres by eliminating the traditional requirement that a plaintiff seeking cy pres show that the settlor had a general charitable intent when a particular charitable purpose becomes impossible or impracticable to achieve."  Unif. Trust Code, supra § 413, cmt.  The Uniform Trust Code eliminates that requirement "because in the great majority of cases the settlor would prefer that the property be used for other charitable purposes, and courts almost invariably find that the settlor had a general charitable intent."  Id.  Thus, under the Uniform Trust Code, except when the terms of a charitable trust would result in distributing trust property to a noncharitable beneficiary, "if the particular purpose for which a trust was created becomes impracticable . . . [or] impossible to achieve . . . , the court may apply cy pres to modify or terminate the trust by directing that the trust property be applied or distributed . . . in a manner consistent with the settlor's broader charitable purposes."  Id.  Under those circumstances, "the trust does

not fail in whole or in part," RSA 564-B:4-413(a)(1), and "the trust property does not revert to the settlor or the settlor's successors in interest." RSA 564-B:4-413(a)(2); see Unif. Trust Code, supra § 405 cmt. ("Under Section 413(a), a trust failing to state a general charitable purpose does not fail upon failure of the particular means specified in the terms of the trust. The court must instead apply the trust property in a manner consistent with the settlor's charitable purposes to the extent they can be ascertained.").

Similar to the Uniform Trust Code, the provision of the UPMIFA at issue, RSA 292-B:6, III, does not condition the grant of an application to modify the restrictions on a charitable gift upon proof that the donor had a general charitable intent, but rather presumes that the donor had such an intent. Under RSA 292-B:6, III, when the charitable purpose of a fund or a restriction contained in a gift instrument on the use of the fund "becomes unlawful, impracticable, impossible to achieve, or wasteful," the court "may modify the purpose of the fund or the restriction on the use of the fund in a manner consistent with the charitable purposes expressed in the gift instrument." In light of New Hampshire's adoption of the Uniform Trust Code and the UPMIFA, we conclude that the common law, as set forth in Opinion of the Justices regarding the cy pres doctrine, is not binding in this proceeding.

To the extent that the Estate asserts that the denial of the motion to intervene has deprived them of a right to bring a breach of contract claim, and, therefore, constitutes a violation of the State and Federal Contract Clauses, we disagree. See N.H. CONST. pt. I, art. 23; U.S. CONST. art. I, § 10. At oral argument, the attorney for the Estate conceded that the Estate could still bring a breach of contract claim against Dartmouth. We express no opinion as to whether such a claim would be viable.

Because we have upheld the trial court's determination that the putative intervenors lack standing to intervene in this UPMIFA action, we need not reach their arguments that the trial court erred by granting Dartmouth's assented-to application to modify the restrictions on the completed charitable gift. Arguments that the putative intervenors raise for the first time on appeal or expressly raise as plain error, see Sup. Ct. R. 16-A, lack merit and warrant no extended consideration. See Vogel v. Vogel, 137 N.H. 321, 322 (1993).

Affirmed.

DONOVAN, J., concurred; HANTZ MARCONI, J., concurred specially.

HANTZ MARCONI, J., concurring specially. I concur in the court's analysis of the merits of the putative intervenors' issues on appeal. I write separately to clarify our procedural requirements on appeal. The denial of the motion to intervene was a final decision on the merits. See Sup. Ct. R. 3 (Comment to definition of "mandatory appeal"). The appeal therefrom was due

to be filed within 30 days of the decision on the timely filed motion for reconsideration. Successive post-decision motions do not toll the appeal period. <u>See</u> <u>Sup. Ct. R.</u> 7(1)(C). Contrary to the putative intervenors' argument, their motion for permission to file an interlocutory appeal, filed after the trial court had denied their motion for reconsideration, did not extend the appeal deadline for the denial of their intervention. Because a denial of a motion to intervene is a final decision on the merits, the attempt to file an interlocutory appeal was unnecessary and did not operate to extend the appeal deadline.

Here, the parties addressed in their briefs the dismissal of this appeal on the basis of its untimeliness. I find no exception to the rule that this appeal is untimely. Simply because the case is initially accepted, does not prevent further procedural scrutiny of compliance with our rules. Were the acceptance of an untimely appeal to result in a reversal of the trial court's decision, the appellant would receive a benefit when, arguably, appellate jurisdiction was not conferred. I would, therefore, dismiss the appeal as untimely.